ROLAND L. BELSOME, Judge.
 

 | Defendant-Appellant appeals his conviction and sentence of life imprisonment
 
 *154
 
 for first degree murder of his sixteen-year-old daughter. For the reasons that follow, we affirm.
 

 STATEMENT OF THE CASE
 

 On July 31, 2008, the State charged the defendant with one count of first degree murder, in violation of La. R.S. 14:30, relating to the May 23, 2003, rape and strangulation death of the sixteen year old victim. The defendant pled not guilty to the charges on August 15, 2003. Following a mental competency (“lunacy”) hearing on June 22, 2004, the defendant was found competent to stand trial. He was again found competent to proceed on August 5, 2004.
 

 On October 23, 2003, the defendant filed Motions to Suppress Evidence, Identifications and Statements, for a Bill of Particulars, and for Discovery and Inspection. On September 30, 2004, the court denied the Motions to Suppress Evidence and Statements. On March 6 and December 14, 2007, and February 22, |⅞2008, the trial court heard testimony relating to the defendant’s Motion to Suppress several identifications, which the court denied. On November 14, 2008, the court denied the defendant’s motion to re-open his Motion to Suppress Statements.
 

 On February 16, 2009, the defendant filed a Motion to Quash, which was denied. The defendant also filed a motion
 
 in li-mine
 
 to prohibit the introduction of evidence regarding certain scientific testing conducted by the NOPD crime lab, arguing that his defense would be prejudiced at trial because he had not had an opportunity to independently test a pair of bloodstained underwear worn by him on the day of the murder, which had been lost in the aftermath of Hurricane Katrina. The trial court denied the motion on February 27, 2009. The defendant sought writs in this Court, which denied relief on March 9, 2009. The Louisiana Supreme Court subsequently denied the defendant’s writ application.
 

 Between March 23 and April 9, 2009, the trial court conducted
 
 voir dire
 
 in order to impanel a death qualified jury. Between April 13 and 18, 2009, the defendant was tried before a twelve person jury. On April 20, 2009, the jury unanimously found the defendant guilty as charged. On April 20, 2009, the jury recommended that the defendant be sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. On May 20, 2009, the trial court sentenced the defendant pursuant to the jury’s recommendation.
 

 FACTS
 

 On the afternoon of Friday, May 23, 2003, the defendant and his sixteen-year-old daughter, Brandy Ferguson, left their home in Kenner, Louisiana to see a movie. Mrs. Kris Ferguson, the defendant’s wife and Brandy’s stepmother, testified that when she called the defendant’s cell phone later that evening, she heard screams that lasted for approximately one minute. Mrs. Ferguson asked ^Brandy if she was okay and if she could hear her, and she heard Brandy groan as if someone had knocked the wind out of her before the cell phone went dead.
 

 In the early morning hours of Saturday May 24, 2003, several motorists telephoned the NOPD’s 911 complaint operator and related seeing a man flagging down motorists on the 1-610 between the Canal Boulevard and St. Bernard Avenue exits, and the body of what appeared to be a dead female on the shoulder of the road. At approximately 1:00 a.m., Detective Sergeant Joseph Waguespack arrived at the reported location and found the distraught defendant standing on the shoulder of the road beside Brandy’s body.
 

 
 *155
 
 Herbert Carver, who made one of the 911 calls on the night of the homicide, testified at trial. Mr. Carver testified that he related to the operator that a man was standing in the right-hand lane of the I-610 just beyond the overpass and was attempting to stop traffic. As Mr. Carver passed the man, he noticed a body lying on the side of the roadway. When Mr. Carver stopped his vehicle, he advised the defendant that he had called 911 and to get out of the roadway. Mr. Carver testified that he approached the victim’s body, which was face down in the grass, touched her shoulder and concluded that she was dead. Mr. Carver further testified that the upper part of the victim’s body was clothed, but the lower portion was nude. The defendant was intoxicated and would not speak to Mr. Carver. When the police and EMS arrived, Mr. Carver explained the events he observed.
 

 Sergeant Joseph Waguespack testified that he was a commander at the homicide unit at the time of the victim’s death and heard the police radio broadcast about a man standing on the 1-610 trying to flag down motorists and the presence of a body on the side of the road. When he arrived at approximately 1:05 a.m. on May 24, 2003, EMS was already on the scene. Sgt. Waguespack testified that he |4observed the victim’s body in a prone position, face down in the grass. He surveyed the area and found a white paper bag containing a Styrofoam box of what appeared to be Chinese food, and approximately eighty-five feet from the container, a blue hair scrunchy, tennis shoes, a pair of blue jeans, and a multi-colored pair of women’s underwear with one side of the strap torn off.
 

 Sgt. Waguespack testified that the defendant told him that the victim was his daughter, Brandy, and that they had attempted to see a movie, and then walked around the shopping mall before arriving at the Daiquiri Shop, where they spoke with two black males. The defendant also informed him that after stopping at the Daiquiri Shop, he and the victim then walked to the McDonald’s on Veterans Highway where they met the same two men, who gave the defendant and Brandy a ride to the Shell Station on Veterans Highway and Downs Boulevard, where they encountered Jessica Bazile and Sam-er Abumusa.
 

 Sgt. Waguepaek testified that defendant stated that Ms. Bazile and Mr. Abumusa drove him and Brandy to 1-10 and Causeway Boulevard, where the two black males in a red car picked them up, at which time one of the men stole the defendant’s gold necklace and pushed him from their car, telling him that he would find his daughter up the road a short distance. The defendant told Sgt. Waguespack that he walked along the roadway for about ten minutes and came upon the lifeless body of his daughter and pulled her body to the curb.
 

 Sgt. Waguespack testified that he observed that the defendant was intoxicated, and when he asked the defendant questions to clarify the conflicting and vague information the defendant was giving him, the defendant became irate, combative, and uncooperative, even physically accosting Sgt. Waguespack and Detective Michael Sam. Unable to calm the defendant, Sgt. Waguespack enlisted |5the aid of Detective Sam, who handcuffed the defendant and placed him in the police vehicle. Sgt. Waguespack testified that he arrested the defendant for two counts of battery on police officers and public intoxication, and had him transported to Central Lockup, and then directed crime lab technicians in processing the scene and collecting evidence. Sgt. Waguespack spoke to the defendant at Central Lockup to glean more information, but the defendant was un
 
 *156
 
 cooperative and demanded an attorney, at which time all conversation ceased.
 

 At trial, Sgt. Waguespack identified photographs of the scene and the victim’s body, explaining the objects depicted in the photographs and their positions at the scene. Sgt. Waguespack further testified that he directed Detective Sam and Detective Andre Giles to confiscate the defendant’s clothing at the police station and place it in Central Evidence and Property.
 

 In the course of the investigation, Sgt. Waguespack spoke with an employee at an Asian restaurant in the Esplanade Mall who recognized a picture of the victim. Sgt. Waguespack testified that she said she remembered serving the defendant and the victim at the restaurant around 6:00 p.m. on Friday, May 23, 2003. Sgt. Waguespack also spoke with an employee at the Daiquiri Shop on Veterans Boulevard, who recognized the victim and the defendant as having visited the shop, and especially remembered them because he asked the victim for identification to verify her age. The Daiquiri Shop employee recalled that the defendant became belligerent and told the employee, “She’s my daughter, she don’t have to show you anything” and then left the shop. Sgt. Wag-uespack’s investigation also led to video footage of the defendant and the victim at the Daiquiri Shop and also on the RTA bus in Kenner.
 

 | (¡Around 6:30 a.m. on May 24, 2003, Sgt. Waguespack returned to the crime scene and inspected the area for evidence, discovering the defendant’s cell phone near the spot where the victim’s clothing was found. That same day, Sgt. Waguespack observed the victim’s autopsy, which revealed that the contents of her stomach matched the food in the container confiscated at the crime scene. Sgt. Wagues-pack obtained the victim’s gold necklace bearing the name “Brandy” and gave it to her grandmother. Sgt. Waguespack testified that he observed the necklace on the victim’s body at the wake.
 

 The Sunday after the victim died, Sgt. Waguespack met with the defendant’s brothers, Frank and Kenny Ferguson, at their request, to view the crime scene and learn about the investigation. Later that afternoon, Sgt. Waguespack went to Central Evidence and Property to look at the clothes the defendant had worn the night of the crime. The clothes — a pair of white socks, blue jean shorts and a pair of jockey-type underwear — had been placed in a plastic bag. Sgt. Waguespack testified that he repackaged the clothing into a paper bag because moisture buildup in a plastic bag can possibly degrade the evidence. After repackaging the clothes, Sgt. Waguespack reattached the original evidence tags.
 

 When examining the clothing, Sgt. Wag-uespack testified that he observed that the underwear was stained with what he recognized as blood, but observed no blood on the blue jean shorts. Sgt. Waguespack concluded that the only way blood would have gotten on the underwear would be if the person who raped and murdered the victim placed the underwear back on the victim after the attack. Sgt. Waguespack contacted Detective Giles and instructed him to process the paperwork to charge the defendant.
 

 |7Sgt. Waguespack visited Mrs. Audrey Ferguson at her home and obtained prearranged taped statements from Audrey and her sons, Frank and Kenny Ferguson. Sgt. Waguespack testified that he interviewed no less than twenty-two witnesses to establish a timeline of events leading up to the victim’s death. Among the witnesses he spoke to was State Trooper Paul Boychin, who supplied Sgt. Waguespack with the video tape of his encounter with the defendant and the victim at 10:00 p.m.
 
 *157
 
 the night of the homicide. Also during the course of the investigation, Sgt. Wagues-paek testified that he obtained a search warrant to collect blood, saliva, and head and public hairs to submit for DNA evidence. With the help of Dr. Jerry Rosenberg of the Orleans Parish Prison, the evidence was collected and logged into Central Evidence and Property. As part of the ongoing investigation, Sgt. Wagues-pack testified that he received the results from serology and DNA testing in connection with the case, and that the results reinforced his suspicion that the defendant raped and murdered his daughter.
 

 Mrs. Loretta Lynn Gillman, Brandy’s mother, testified at trial, stating that she and the defendant were married for two or three years, and that Brandy was born of that union. The couple divorced when Brandy was about three years old. Mrs. Gillman relinquished custody of Brandy to the defendant and had very little contact with her until Brandy became a teenager, at which time the victim and Mrs. Gillman would talk on the phone every weekend. Mrs. Gillman said that Brandy was “slow” like her, meaning that Brandy needed special supervision in school and at home.
 

 Samer Abumusa and his girlfriend, Jessica Bazile, also testified at trial regarding their encounter with the defendant and the victim at the Shell gas station at Downs Boulevard and Veterans Boulevard in Ken-ner on the evening of May 23, |s2003. Ms. Bazile testified that the defendant, carrying a six-pack of beer, approached the couple and asked if she and Mr. Abumusa would drive him and his daughter to Florida. Ms. Bazile recognized Brandy as someone she had gone to school with, and Mr. Abumusa recognized Brandy as someone from his neighborhood. Ms. Bazile testified that they advised the defendant that they could not go as far as Florida, but that they could give him a ride to the Bonnabel Boulevard exit of the interstate. Mr. Abumusa drove, and Ms. Bazile sat in the front passenger seat. The defendant sat in the back seat behind Mr. Abumusa, and Brandy sat behind Ms. Bazile. As the foursome rode, Ms. Bazile testified that she observed that the defendant was intoxicated and was touching Brandy in an inappropriate manner, and not behaving like a father toward his daughter.
 

 Ms. Bazile further testified that when she asked Brandy if she was all right, she responded “yeah” and confirmed that the defendant was her father. During the duration of the trip, about thirty to forty minutes, the defendant’s cell phone rang repeatedly, but the defendant did not answer it. Ms. Bazile also testified that she could tell something was wrong by Brandy’s behavior, and noticed that the defendant kept telling Brandy to have a beer and “let loose,” but that Brandy refused, saying she was too young to drink.
 

 Ms. Bazile further testified that Brandy and the defendant continued to argue about drinking until the defendant asked to be let out of the car on the interstate near the Bonnabel Boulevard exit, but then changed his mind and asked to be let out of the car at the end of the exit ramp because “he and his girl couldn’t handle their business” on the interstate.
 

 Mr. Abumusa testified that the defendant was a belligerent drunk who repeatedly asked him and Ms. Bazile to party with him, and that he told them he Iflknew where to get the drugs. Mr. Abu-musa also testified that the defendant’s phone was ringing the entire time that he and Brandy were riding in his vehicle. He recalled that it was approximately 9:00 p.m. when they saw Brandy and the defendant at the gas station. Upon learning of Brandy’s death, Ms. Bazile and Mr. Abu-musa contacted the police and gave recorded statements to the police. Both wit
 
 *158
 
 nesses identified pictures of Brandy and the defendant.
 

 Following Mr. Abumusa’s testimony, the State and the defense entered into three stipulations. First, they stipulated that the copy of the Daiquiri Shop video was a true and accurate portrayal of the events that happened the evening of May 23, 2003. The video was played for the jury. Second, the State and the defense stipulated that if crime scene technician Robin Rucinski were called to testify, she would testify that she took photographs of the crime scene, drew a sketch, and made note of minutes from the defendant’s cell phone. Third, the State and the defense stipulated that if crime lab technician Steven Villere were called to testify, he would confirm that he appeared on the scene, and that he took a series of photographs, collected certain items of evidence, which were logged into Central Evidence and Property, and also prepared a sketch of the scene.
 

 Dr. Alvaro Hunt testified as an expert in the field of forensic pathology that he was employed by the Orleans Parish Coroner’s Office and performed the autopsy on Brandy Ferguson on May 24, 2003 at 9:15 a.m. Dr. Hunt stated that Brandy was five feet, three inches tall and weighed 123 pounds. Dr. Hunt classified Brandy’s death as a homicide, and noted the cause of death as manual strangulation. Dr. Hunt stated that death by manual strangulation can be caused by either applying enough force to the arteries in the neck to occlude the blood supply to the brain or completely occluding the windpipe itself, causing suffocation. He 11rtstated that complete occlusion of the windpipe is difficult to achieve due to its cartilaginous structure and the struggle of the victim when he or she becomes air hungry; it can take several minutes for the victim to die in this manner.
 

 During the autopsy, Dr. Hunt observed that Brandy’s entire face was discolored due to its suffusion with blood and that her neck showed a small bruise on either side underneath the jaw. Dr. Hunt testified that he also observed what he believed to be fingernail abrasions on her neck, and concluded that Brandy had been strangled from the front. Dr. Hunt further testified that he also observed marked swelling of Brandy’s left cheek and extensive hemorrhaging around her left eye, which he opined was caused by a single blow of significant force. Dr. Hunt noted that the lower half of Brandy’s body came to him nude and that she was wearing a brassiere that had been pulled up to her neck, and that her necklace, a small gold chain with the name “Brandy”, was bent backwards in several places, probably as a result of the strangulation itself.
 

 Dr. Hunt observed clotted blood on Brandy’s thighs as well as a large amount of non-clotted blood outside Brandy’s vagina, on her inner thigh and buttocks, and in the crease of her buttocks, and determined that, in all probability, the non-clotted blood had continued to seep from the lesions found inside Brandy’s vagina. Dr. Hunt further testified that the vaginal injuries were new, and that he discovered a hemorrhage of one of the ligaments that attached Brandy’s uterus to the pelvis, which he had never seen before. In his opinion, such trauma was likely the result of “very forceful penetration of the vagina, such that the cervix ... was moved,” causing the ligaments to stretch, and that such damage could only be caused by penetration.
 

 |1TPr. Hunt also testified that Brandy’s brain was swollen due to hemorrhaging of the blood vessels, and that her back was covered with small linear abrasions as well as a large amount of dirt and grass and a moderate number of ants. Inspecting
 
 *159
 
 Brandy’s windpipe, Dr. Hunt noted extensive bleeding around the vocal cord as well as a cartilage fracture on the inside of the windpipe, which he stated was consistent with manual strangulation. Dr. Hunt had only seen such cartilage fractures in one previous manual strangulation case that he could recall and testified that it takes an unusual amount of force to produce such injury. On the mid-portion of Brandy’s collarbone, Dr. Hunt further testified that he observed deep bruising and hemorrhaging, which he attributed to the fracturing of her windpipe, and also noted hemorrhaging in Brandy’s temporalis muscles, which he testified was “highly characteristic in forms of [manual] strangulation” where the blood flow is cut off from the head and upper neck. There was no evidence of tearing or laceration of the anus.
 

 Dr. Hunt also collected blood, urine, and vitreous fluid from Bandy’s body and presented it to the Coroner’s toxicology laboratory to test for the presence of drugs or alcohol in her system. The toxicology results indicated that no alcohol or drugs were present in Brandy’s blood. Dr. Hunt also concluded a “P-30 test” to test for the presence of seminal fluid in Brandy’s vagina, anus, and mouth, which were all negative.
 
 [1]
 
 Dr. Hunt explained that this was not necessarily evidence that penetration did not occur because the perpetrator may have been wearing a condom or have been sterile.
 

 |12On cross-examination, Dr. Hunt testified that a person being manually strangled would be able to scream unless the windpipe was completely blocked. He also testified that the struggle could leave defensive marks on the attacker. Dr. Hunt further testified that he had discovered from discussions with attorneys in the years since Brandy’s murder that she was at the end of her menstrual cycle at the time of her death; however, menstrual blood is distinguishable from arterial blood because it is darker and may contain small blood clots and liquid blood, and also contains small amounts of blueish-to-brown tissue from the uterine lining itself. Dr. Hunt testified that he did not perform a microscopic examination of the blood found in Brandy’s uterus to determine its origin because he was able to tell from the freshness of her vaginal lacerations that they were the most likely source of the blood.
 

 Dr. Hunt agreed that hemorrhaging of the broadband ligaments could occur through consensual intercourse, but that it would have to be an unusually aggressive form of consensual intercourse, and stated that the bleeding in this case occurred within twenty-four hours of the autopsy. Dr. Hunt acknowledged that such vaginal injuries need not necessarily have been caused by penile penetration, but could have been caused by a foreign object. On re-direct examination, Dr. Hunt testified that Brandy’s vagina showed common signs of being immediately post-menstrual or in the last twenty-four hours of the menstrual cycle. He also stated that he was unable to take clippings from Brandy’s fingernails to test for the presence of DNA because her nails were bitten or cut so deeply back that there was no specimen to take.
 

 Ms. Terrell Perkins was employed as a Regional Transit Authority bus driver on May 23, 2003. The bus was fitted with both visual and audio |^surveillance equipment. Ms. Perkins testified that the defendant and the victim boarded her bus at the Esplanade Mall in Kenner, at which time the defendant began to question Ms. Perkins about her off-duty activities, and wanted to know if there was a daiquiri shop in the area. The defendant told Ms.
 
 *160
 
 Perkins that it was the victim’s birthday and that he wanted to get her a tattoo below her navel. He then asked if Ms. Perkins would like to join him and his fiancée in a “threesome” and made other lewd comments. Ms. Perkins testified that she found the defendant’s conduct inappropriate because he touched the victim’s arm in a manner which made her uncomfortable, and noticed that as the defendant and the victim exited the bus, the victim seemed apprehensive about getting off with the defendant. Ms. Perkins testified that she overheard the victim tell the defendant that she did not want to go to a daiquiri shop. After the homicide, Ms. Perkins met with an NOPD homicide detective and identified photographs of both the victim and the defendant.
 

 Louisiana State Trooper Paul Voitier also testified at trial. At approximately 9:45 p.m. on May 23, 2003, Trooper Voitier was driving westbound on 1-610 when he spotted the defendant and the victim walking on the shoulder of the road near the Bonnabel Boulevard exit. Upon seeing the defendant and the victim, Trooper Voitier circled around on the interstate and activated his emergency lights, which activated his car’s video surveillance camera. Trooper Voitier testified that he approached the defendant and the victim as they walked on the eastbound 1-610 overpass, at which time the defendant informed him that he and the victim were on their way to Florida. For their safety, Trooper Voitier drove the pair off the interstate at the Canal Boulevard exit.
 

 |14EMS technicians Yolanda Wilson and Joe Glorioso responded to the emergency call in this ease and testified at trial. When Ms. Wilson arrived on the scene, the defendant appeared frantic and intoxicated, and told her that he and the victim were walking to Florida, when they were picked up by a motorist and then thrown from the car. Joe Glorioso’s testimony corroborated Ms. Wilson’s recitation of events, but added that the victim was dead by the time they reached the scene, and that her body was face down in a grassy area on the side of the interstate. Mr. Glorioso testified that he learned from the intoxicated defendant that he was the victim’s father, and that the defendant also told him that he and the victim were picked up by a man who subsequently forced him from the vehicle, so he walked along the interstate until he came upon the victim’s body.
 

 Ms. Claudia Richards, a passenger on the RTA bus with the defendant and the victim, also testified at trial. Ms. Richards was employed by Dillard’s Department Store in the Esplanade Mall on May 23, 2003, and boarded the bus at the mall. As the bus proceeded on its route, Ms. Richards testified that the defendant appeared intoxicated and was speaking very loudly, and that the defendant also propositioned the bus driver for sex. The victim and the defendant exited the bus at the Daiquiri Shop shortly after they got on the bus. The next day, Ms. Richards saw the victim’s picture in the paper with an article requesting anyone who had any information about the crime to contact the NOPD, which she did, and was interviewed by Sgt. Waguespack.
 

 Mrs. Kris Ferguson, who had been married to the defendant for six years, also testified at trial. Ms. Ferguson testified that she, the defendant, and Brandy were living with the defendant’s mother, Audrey Ferguson, in Kenner at the time of Brandy’s death. Mrs. Ferguson had gotten off from work between 7:00 and 11fi8:00 p.m. on May 23, 2003. When she arrived home, only Audrey was there. Although she was aware that the defendant had planned to take Brandy to a movie at the mall, Mrs. Ferguson testified that she spoke with the
 
 *161
 
 defendant on his cell phone before she left work and learned that he and Brandy were not allowed into the movie theater because they had drinks. Mrs. Ferguson testified that she thought the defendant seemed drunk when they spoke on the phone, and told him that it was okay if he wanted to go drinking that night, but that he had to bring Brandy home beforehand. Mrs. Ferguson had spoken with Brandy earlier in the evening, and at that time Brandy told her she was all right.
 

 Mrs. Ferguson testified that she and her mother-in-law, Audrey, tried to call the defendant that night approximately twenty times; although his phone would pick up, no one would answer before it disconnected. Mrs. Ferguson could hear Brandy saying, “Daddy, I love you,” and “Daddy, watch out.” When Brandy and the defendant had not returned home by 10:00 p.m., she began calling his cell phone every five minutes, but the response was the same. As Mrs. Ferguson continued to call she thought she heard someone giving directions and background noises such as cars driving over an overpass, which lead her to believe that Brandy and the defendant were somewhere on the interstate.
 

 Mrs. Ferguson testified that later that evening, as she continued to call the defendant’s cell phone, she heard curdling screams for approximately one minute. She asked Brandy if she could hear her, and suddenly heard Brandy groan as if someone had knocked the wind out of her before the phone went dead. Afraid that someone might have been beating up or murdering Brandy, Mrs. Ferguson called hfithe Kenner Police while her mother-in-law continued attempting to reach Brandy.
 
 [2]
 
 Mrs. Ferguson then called one of the defendant’s brothers, and one of them went with Mrs. Audrey Ferguson to look for Brandy. Later that night, she received a phone call from a detective informing her that Brandy had been found dead. Mrs. Ferguson testified that she had no knowledge of any plans the defendant and Brandy had to go to Florida that weekend. Mrs. Ferguson confirmed that Brandy was a special education student.
 

 New Orleans Police Officer Michael Sam responded to the call in the early morning hours of May 24, 2003, and accompanied Sgt. Waguespack to the shoulder of the I-10 expressway. Officer Sam testified that he noted the placement and condition of the victim’s body and then proceeded to direct the flow of the traffic through the area. While Sgt. Waguespack spoke with the defendant, Officer Sam testified that he overheard part of their conversation, including the defendant’s mention of a black male. When Officer Sam arrived on the scene, the defendant appeared agitated, and during the conversation with Sgt. Waguespack, the defendant became belligerent and shoved Sgt. Waguespack. Officer Sam intervened, and the defendant pushed him also. After the officers subdued the defendant, Officer Sam issued a citation to the defendant, charging him with battery of the officers and public intoxication, and placed the defendant in the police vehicle to transport him to Central Lockup, where he confiscated the defendant’s clothing.
 

 117Officer Sam testified that the defendant’s socks, blue jeans, and underwear were placed in a clear plastic bag, and that
 
 *162
 
 he was in close proximity when Detective Andre Giles transferred the clothing to Central Evidence and Property (CEP) and filled out the evidence tags and logged the clothing into CEP. Officer Sam identified the evidence receipt and identified the item number on the receipt as the same one associated with this case, and also identified photographs of the jean shorts, t-shirt, and underwear as depicting the same items he witnessed the defendant remove at Central Lockup. Officer Sam further testified that he noticed stains on the front of the defendant’s underwear when he saw the defendant remove them on May 24, 2003.
 

 Officer Sam identified copies of CEP evidence receipts under the same item number assigned to Brandy’s murder that showed evidence being logged in on both May 24 and May 25, 2003. Officer Sam testified that he was present when Detective Giles logged all of the defendant’s clothing into CEP in the same plastic bag on May 24, and that neither he nor Detective Giles returned to CEP on May 25 to submit evidence in the case.
 
 [3]
 
 Next, Officer Sam identified a blown-up copy of a CEP receipt showing the defendant’s white underwear being logged into evidence on May 25, under the same receipt number as the other pieces of clothing. Officer Sam testified that the receipt was incorrect and that the defendant’s underwear was not logged in on May 25; rather, the clothing was logged in on May 24, immediately after it was confiscated from the defendant.
 

 Detective Andre Giles, who also responded to the scene that evening, testified at trial. Detective Giles testified that when he arrived at the scene, he was | 1 «informed by Sgt. Waguespack that Brandy’s body had been removed from the scene, and the defendant was handcuffed and sitting in the police vehicle. At that time, the defendant was not a suspect in the homicide. Detective Giles testified that he received all the information Sgt. Waguespack had on the case and learned that the defendant would be interviewed at police headquarters.
 

 At police headquarters, the defendant told Detective Giles that defendant that two suspects picked him and Brandy up on the interstate, and that the two suspects let the defendant out of the car at a certain area and told him they would let his daughter out farther down the road. When Detective Giles tried to clarify information the defendant gave, the defendant asked for an attorney, and the interview ended. Prior to the brief conversation between Detective Giles and the defendant, the defendant requested a cup of water and a cigarette. After the interview ended, Detective Giles confiscated the cup and the cigarette and transported the defendant to Central Lockup where his clothes were confiscated by Detective Michael Sam and given to Detective Giles in a clear plastic bag. Detective Giles testified that at no time did he open the bag, or remove or add clothing to the bag once it was logged in.
 

 Detective Giles identified the evidence receipt he received at Central Evidence indicating that he had logged in blue jean shorts and a pair of white socks in one package and one cup containing water and a cigarette butt for DNA testing in a separate bag. Though he was unaware at the time that the defendant’s underwear was included in the items confiscated from the defendant, he later learned of its presence from Sgt. Waguespack. The evidence receipt reflected that the items were
 
 *163
 
 confiscated at 15:45 on May 24, 2003. Although the receipt also indicated that the items were logged in on May 24, at 5:19 a.m., Detective Giles h testified that the time was incorrect, because he did not log in the defendant’s underwear on May 24. Although the underwear was in the bag of clothing confiscated from the defendant on May 24, it was not logged in until May 25.
 

 Detective Giles explained the discrepancy as simply human error on his part, and testified that he became aware of the error when Sgt. Waguespack advised him the defendant’s underwear was in the bag with the blue jean shorts and the pair of socks.
 
 [4]
 
 Accordingly, Detective Giles returned to Central Evidence on May 25 and filled out another evidence tag which correctly reflected the contents of the bag, including the underwear. Detective Giles further explained that the reason the underwear was not initially listed on the evidence tag is because he could not see them in the bag because it was rolled up within the blue jean shorts when the clothing was provided to CEP.
 

 Lieutenant Brian Monteverde, the Assistant Commander of the evidence room, also testified at trial. Lt. Monteverde explained that he was working in the evidence room as a sergeant in 2003 and confirmed that CEP was located in the basement of Central Lockup at that time and was completely inundated by water when Hurricane Katrina struck the city, destroying all items in CEP. As a result, no evidence relative to this case survived.
 

 Lt. Monteverde explained the procedure for submitting and logging in evidence and the difference between the two. When evidence is delivered to CEP by a detective or an officer on duty, the detective or officer fills out a tag for each item indieat-ing his name and badge number and noting date, time and location where the item(s) was/were received and a description of the item(s). The information is entered into the computer which lists the information submitted, andj^the computer automatically enters the correct date and time, regardless of the date and time the officer may have listed on the tag. The date and time generated by the computer cannot be altered. The detective or officer then inspects the information listed on the tag and acknowledges its correctness by placing his initials next to his signature and maintains a receipt verifying the items have been placed in the evidence room. If a package is delivered to CEP by a detective or officer containing five items, but the card that is submitted with the bag only contains three items, the receipt will reflect only the three items listed by the detective/officer, not five. If the detective or officer comes back at another time to document the two items which were not initially documented, the receipt reflecting the two items would not bear the same receipt number as the original receipt; the computer generates a new receipt number.
 

 In addition, the first receipt receives a bar code number from the receiving clerk, and the second receipt would receive a different bar code number. Bar code numbers are assigned in sequential order. If an item pertinent to one case is logged in on one day and an item relative to that same case is logged in on the following day, there will be a skip in sequential order caused by evidence logged in the intervening time frame. Lt. Monteverde confirmed that the CEP staff is supposed to verify the contents of evidence bags it receives, if the evidence cannot all be seen
 
 *164
 
 as submitted. He also testified that NOPD policy mandated that all evidence be logged in prior to the end of an officer’s shift in order to maintain its integrity.
 

 Joseph Tafaro, a currently retired NOPD criminalist and serologist, testified at trial. Mr. Tafaro explained to the jury that serology is the study of bodily fluids, such as blood, seminal fluid, and saliva. He tested various items of clothing 121 associated with this case and prepared a written report of his findings. Mr. Tafa-ro’s testing on the defendant’s t-shirt proved positive for blood and the defendant’s underwear tested positive for both blood and seminal fluid. Visual laboratory analysis of the defendant’s denim shorts failed to reveal the presence of blood or seminal fluid. Likewise, testing done on the defendant’s tennis shoes did not reveal the presence of blood. Mr. Tafaro also tested the victim’s underwear, bra and t-shirt, all of which proved positive for blood.
 

 Ms. Anne Montgomery testified that in 2003, she was employed by the city as a DNA Technical Leader, as well as working in Jefferson Parish as its forensic DNA lab director,
 
 [5]
 
 and in her professional lifetime, she has performed thousands of DNA tests and has testified as an expert witness for both the State and the defense. Ms. Montgomery explained to the jury that DNA is a molecule found within virtually every cell of the human body. She testified that she compared a sample of DNA belonging to Brandy Ferguson against an unknown blood sample.
 
 [6]
 
 Ms. Montgomery identified the report that she issued in connection with Brandy’s case, which indicated that the samples received by the DNA lab corresponded to the barcodes associated with those items at CEP.
 

 Ms. Montgomery received six items of evidence, the first of which was Brandy’s DNA card, which contained preserved samples of the genetic material to be analyzed. Other items included two vials of blood from the defendant, a vial of his saliva, and a cutout from his underwear and t-shirt. Ms. Montgomery’s analysis indicated that the blood on both the defendant’s underwear and t-shirt was from Brandy Ferguson, and that her genetic profile occurred in a frequency of one 122⅛ ten billion people, which was a conservative estimate.
 
 [7]
 
 The defendant was absolutely excluded as the donor. Ms. Montgomery confirmed that the items to be tested were received in the DNA lab by analyst Debra Lynn Wesley on June 17, 2003, at 11:15 a.m. The items were stored in a freezer until tested and returned to CEP on July 9, 2003. Ms. Montgomery confirmed this through both the NOPD and DNA lab’s internal chain of custody documentation. She also confirmed that only a small portion of each item was sampled in order to leave evidence for further retesting.
 

 On cross-examination, Ms. Montgomery acknowledged that, as supervisor, she did not actually perform the testing on the defendant’s underwear and t-shirt, but was responsible for reviewing test results. She reiterated that all her analysts met the FBI’s quality assurance standards. She also said that the criminalist who actually performed the analysis on the items in question was Debra Lynn Wesley, who
 
 *165
 
 was no longer with the crime lab. Ms. Montgomery stated that she would not know if someone had tampered with the evidence before it reached the DNA lab.
 

 Ms. Montgomery testified that the DNA lab has a written standard operating procedure manual or protocol that helps to ensure consistency of the methods used and reliability of the results obtained by the analysts in the lab, and which is required by the FBI. She also explained that analysts are required to have a Bachelor of Science degree and to complete six months of DNA analysis training and pass a competency test in order to perform testing on evidence. Furthermore, attendance at a scientific meeting, such as one by the Louisiana Association of Forensic Scientists, is required as part of continuing education. Each analyst was [^required to take a proficiency or competency test twice a year. Ms. Montgomery emphasized that she was only qualified to speak to certification requirements in the fields of molecular biology and DNA testing.
 

 Defense witness Dr. Douglas Posey of the Georgia Bureau of Information was qualified as an expert in clinical, forensic and anatomic pathology. Dr. Posey reviewed the autopsy protocol on Brandy Ferguson. He explained that a laceration is blunt trauma as opposed to sharp force trauma and is a crushing injury. According to Dr. Posey, by definition, a laceration does not bleed; hence “superficial vaginal lacerations with vaginal bleeding” as noted in Dr. Alvaro Hunt’s autopsy protocol was not possible. Dr. Posey further indicated that it is possible to determine when a laceration occurred by changes noted in the nature of the laceration. Dr. Posey testified that a laceration begins to heal three days after the trauma; a proliferation phase occurs from three to ten days; and the remodeling phase begins up to fourteen days post-trauma. Dr. Posey further noted that Dr. Hunt’s report did not indicate testing to determine the age of lacerations found on Brandy’s body.
 

 Dr. Posey testified that the type of lacerations on Brandy’s body could occur during consensual sex, and that nothing in Dr. Hunt’s report would allow him to conclude that Brandy was raped as opposed to having had engaged in consensual intercourse. Nor, in his opinion, was there any evidence that Brandy suffered penile penetration. Dr. Posey testified that the broad ligament hemorrhage sustained by Brandy more resembled a contusion or bruise, and that such a bruise required at least twenty-four hours after trauma to form. Dr. Posey further testified that the autopsy protocol did not indicate the number of assailant(s), their gender or race. Dr. Posey agreed that manual strangulation was the cause of death.
 

 |24Under cross-examination, Dr. Posey admitted that he did not attend the autopsy on Brandy’s body and that he was paid by the defense for his trial testimony. He also acknowledged that vaginal lacerations can be caused by a penis during a rape, and that the term “laceration” could be used to describe a cut. Moreover, he testified that all of the types of injuries seen in Brandy’s vaginal area could be consistent with a very violent sexual assault. Though he was advised by defense counsel that Brandy was at the end of her menstrual cycle at the time of her death, he was not qualified to independently confirm that fact because he received that information from Brandy’s family. Finally, Dr. Posey testified that the types of injuries seen on Brandy’s body could have been caused by her struggle while being strangled, and that it was possible that the assailant would not have had any visible injuries.
 

 Dr. Alvaro Hunt was recalled by the State and testified, contrary to Dr. Posey’s assertion, that a laceration is, in fact, a
 
 *166
 
 tear in the skin caused by a knife, razor, glass or other similar instrument, and that the small blood vessels in the vicinity of the tear begin to bleed. Thus, Brandy Ferguson suffered two lacerations in the vaginal vault. Dr. Hunt testified that, based upon his inspection of Brandy’s uterus, which did not contain any blood, he concluded that the blood found on Brandy’s legs and within her vaginal canal were from lacerations, not her menstrual cycle. Furthermore, the endometrial lining of the uterus was flat, firm and round as opposed to prior to menstruation, when the lining of the uterus is thick’ and smooth. Dr. Hunt further stated that the blood present on Brandy’s legs resulted from the injury to the broad ligament, and that injury occurred less than twenty-fours prior to death.
 

 ^ERRORS PATENT
 

 A review for errors patent on the face of the record reveals none.
 

 ASSIGNMENT OF ERROR NUMBER 1
 

 In the first assignment of error, Defendant argues that the trial judge erred in recognizing Criminalist Joseph Tafaro as an expert in serology.
 

 The standard for accepting expert testimony was set forth in
 
 State v. Foret,
 
 628 So.2d 1116 (La.1993), wherein the Louisiana Supreme Court adopted the test set forth in
 
 Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 
 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
 
 Daubert
 
 “requires the trial court to act in a ‘gatek-eeping1 function to ‘ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.’ ”
 
 State v. Chauvin,
 
 2002-1188, p. 5 (La.5/20/03), 846 So.2d 697, 700-701 (quoting
 
 Daubert, 509
 
 U.S. at 589, 113 S.Ct. at 2795). Likewise, a trial court has great discretion in determining the competence of an expert witness, and that determination will not be overturned absent an abuse of discretion. La. C.E. art. 702.
 

 Generally, the test of competency of an expert is the knowledge of the subject about which the expert is called upon to express an opinion.
 
 State v. Kunzman,
 
 31,976, p. 10 (La.App.2d Cir.5/5/99), 741 So.2d 112, 118. “A combination of specialized training, work experience and practical application of the expert’s knowledge can combine to demonstrate that a person is an expert.”
 
 State v. Gipson,
 
 37,132, p. 16 (La.App. 2 Cir. 6/25/03), 850 So.2d 973, 982. Courts may also consider whether a witness has previously been qualified as an expert.
 
 State v. Craig,
 
 95-2499 (La.5/20/97), 699 So.2d 865 (citing
 
 State v. Lewis,
 
 351 So.2d 1193 (La.1977)).
 

 |2fiIn this case, Mr. Tafaro testified that he was employed as a Criminalist II in the NOPD Crime Lab until 2005. He worked for the NOPD for thirty-two years with twelve of those years served in the crime lab performing serology testing. His education included receiving a Bachelor of Science degree in biological science from Louisiana State University in 1965 and a Master of Arts degree in marine biology from California State University in 1968. He had previously been qualified as an expert in serology in other sections of Criminal District Court. Mr. Tafaro’s continuing education included at least one seminar in serology, as well as seminars in DNA given by the Jefferson Parish Coroner and Dr. Henry Lee of the Connecticut State Police. Although Mr. Tafaro could not recall whether there were written serology protocols at the NOPD crime lab, he stated unequivocally that he, as all NOPD criminalists, received on the job training and were taught by more experienced sexologists how to conduct fluids analysis correctly.
 

 The Louisiana Supreme Court also upheld a qualifying witness as an expert with
 
 *167
 
 a profile similar to Mr. Tafaro’s in
 
 State v. Lewis,
 
 351 So.2d 1193 (La.1977). In
 
 Lewis,
 
 the Court affirmed the district court’s qualification of a fourteen year veteran Louisiana State Police Officer who had been assigned to the crime lab for approximately ten years as an expert in fingerprint identification and comparison. During the first seven years with the crime lab, the officer was engaged primarily in identifying fingerprint cards under the supervision of two fingerprint experts. Mr. Tafaro’s last three years with the lab had been devoted exclusively to casework in the field of fingerprint identification, analysis and comparison. He testified regarding his attendance at several seminars at LSU dealing with scientific investigation techniques, and confirmed that fingerprint identification was one of the subjects included in the curriculum. Furthermore, Mr. Tafaro regularly | ¡^consulted FBI publications on fingerprinting and testified that he had read several books on the subject. Additionally, he had been accepted as a qualified expert in the field of fingerprint identification and comparison by district courts in several other parishes.
 

 Additionally, in cases on appeal in this circuit, Joseph Tafaro has been accepted as an expert in serology by stipulation in various sections of Criminal District Court, or his status as an expert has been affirmed by this Court when called into question.
 
 See, e.g., State v. Robichaux,
 
 2000-1234 (La.App. 4 Cir. 3/14/01) 788 So.2d 458;
 
 State v. Woods,
 
 2001-1995 (La.App. 4 Cir. 10/30/02), 830 So.2d 559;
 
 State v. Huckabay
 
 2000-1082 (La.App. 4 Cir. 2/6/02) 809 So.2d 1093;
 
 State v. Hailey,
 
 2002-1738 (La.App. 4 Cir. 9/17/03), 863 So.2d 564;
 
 State v. Bell,
 
 2005-0808 (La.App. 4 Cir. 12/6/06), 947 So.2d 774.
 
 [8]
 

 The defendant also argues that he filed a Motion for a
 
 Daubert
 
 hearing on the test methodology employed by Mr. Tafaro, but the motion was not acted upon by the trial court. Nevertheless, “an irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” La.C.Cr.P. art. 841(4). Furthermore, the Defendant has not shown
 
 *168
 
 any abuse of the district court’s ^discretion in not subjecting the validity of the test methodology to
 
 Daubert
 
 analysis.
 

 Mr. Tafaro testified that he employed a reduced phenothaline test to analyze blood, which he pointed out had been relied on for eighty-three years prior to Brandy Ferguson’s death. Defendant presented no evidence to controvert that fact or to otherwise call into question the long standing reliance and validity of that testing method, especially given its function in analyzing a substance as common as blood.
 
 See State v. Skipper,
 
 284 So.2d 590, 591 (La,1973)(holding that “[b]lood is such a common thing, a lay witness may properly testify that he recognizes blood as such” and “[a]n expert witness or scientific analysis is not required to identify blood under all circumstances”).
 

 ASSIGNMENT OF ERROR NUMBER 2
 

 Defendant’s second assignment presents two issues for review. First, defendant argues that he was denied the right to independently test the blue jeans, underwear, and t-shirt seized from him due to the State’s incompetence, thereby prejudicing his ability to present a defense. Second, Defendant argues the State failed to establish the chain of custody regarding his underwear and t-shirt, thus rendering Ms. Anne Montgomery’s DNA analysis of those items inadmissible at trial.
 

 With regard to Defendant’s independent testing claim, both the Sixth Amendment of the United States Constitution and Louisiana Constitution, Article I, Section 16, provide that a criminal defendant has the right to present a defense. La.C.Cr.P. art. 718 allows a defendant, upon motion, to scientifically test tangible objects within the possession, custody or control of the state which “1) are favorable to the defendant and which are material and relevant to the issue of guilt | ¡,3or punishment, or (2) are intended for use by the state as evidence at the trial, or (3) were obtained from or belong to the defendant.”
 

 In
 
 State v. Clark,
 
 414 So.2d 737, 740 (La.1982), the Louisiana Supreme Court recognized that a defendant’s right to present a defense may be impaired when a defendant is denied the opportunity to have his expert examine a piece of critical evidence:
 

 Fundamental fairness is violated when a criminal defendant on trial for his liberty is denied the opportunity to have an expert of his choosing, bound by appropriate safeguards imposed by the Court, examine a piece of critical evidence whose nature is subject to varying expert opinion....
 

 State v. Clark,
 
 414 So.2d at 740.
 

 Thus, where there is a sufficient amount of the evidence, a defendant should be permitted to conduct an independent examination.
 
 Id.
 
 (citing
 
 State v. Migliore,
 
 261 La. 722, 260 So.2d 682 (1972)). Significantly, however, the Louisiana Supreme Court explicitly recognized that the “unavailability of the evidence for further testing does not in itself so prejudice defendant’s right to a fair trial as to warrant a dismissal of the prosecution.”
 
 Clark,
 
 414 So.2d at 741 (emphasis added).
 

 In
 
 Clark,
 
 a defendant charged with aggravated rape filed a motion to quash the bill of information, arguing that the State failed to preserve a bed sheet containing a large seminal stain, vaginal swabs and washings from a rape kit. The evidence was examined and analyzed by the state at its crime lab. The defendant received the results of the testing and employed two experts. However, the defendant’s experts could not test the evidence because the test tube containing the vaginal washings was broken, the slide containing the sample could not be found, and the bed
 
 *169
 
 sheet was not frozen which, according to the defendant’s experts, |S0caused the enzyme properties of the seminal stain to deteriorate rapidly. Thus, the defendant argued that he was prevented from running further tests that could rule him out as the perpetrator of the offense.
 

 Although the trial court determined that the State was negligent in failing to properly preserve the evidence for further testing and quashed the indictment, the Louisiana Supreme Court reversed, finding that “mere negligence in preserving evidence, which prevents testing by defendant for possible exonerating characteristics, is not such a denial of fundamental fairness that the prosecution must be dismissed.”
 
 Clark,
 
 414 So.2d at 741 (emphasis added).
 

 The Court further stated that the defendant could present evidence to show the inconclusive nature of the tests performed at the crime lab, and that the jury should be allowed to evaluate the testimony and weigh it accordingly. The Court relied in part on
 
 State v. Boyd,
 
 359 So.2d 931 (La.1978), wherein the defendant moved for a mistrial on the ground that he was denied the opportunity to make an independent examination of a blood sample taken off his pants because the entire sample was consumed by the tests conducted by the State. The Supreme Court found no error in the trial court’s denial of defendant’s motion for mistrial.
 
 Id.
 

 Similarly, in
 
 State v. Tuesno,
 
 456 So.2d 186, 190 (La.App. 4th Cir.1984), this Court found no error in the trial court’s refusal to quash the indictment on the basis that the defendant was unable to inspect the evidence of stolen meat prior to its disposal. The defendant in
 
 Tuesno
 
 was charged with possession of the stolen meat, valued in excess of $500.00. The defendant claimed that he was prevented from preparing a defense as to the evidence’s value, which was an essential element of the crime. This Court held that the defendant was not prejudiced by his inability to examine the meat because he had an adequate opportunity to crossjexaminesl witnesses who testified to its value. Furthermore, this Court recognized that the defendant was successful on cross-examination because the jury found defendant guilty of a lesser crime, possession of stolen property valued between $100.00 and $500.00.
 

 Likewise, in
 
 State v. Frazier,
 
 2003-1219 (La.App. 5 Cir. 3/30/04), 870 So.2d 1075,
 
 writ denied,
 
 2004-1290 (La.10/29/04), 885 So.2d 584, the defendant unwittingly sold cocaine to an undercover narcotics officer. The defendant failed to appear for his scheduled arraignment on February 17, 1999, and, pursuant to an
 
 alias capias,
 
 was finally arraigned fifteen months later on May 17, 2000. Defense counsel filed for discovery prior to the defendant’s first arraignment date and received the State’s response on July 18, 2000. The defendant failed to appear for trial on September 5,’ 2000, and, pursuant to another attachment, finally appeared for trial on May 19, 2003, which was continued on his motion. Twice more on defense motions, the trial was continued. After the second continuance on June 25, 2003, retained counsel for the defendant filed another request for discovery and a bill of particulars, specifically requesting information relating to the State’s testing of any physical evidence. The trial was reset for August 12, 2003. No response by the State to the second discovery request appeared in the record. On the day of trial, defense counsel made an oral motion for the production of the cocaine for independent testing. The State informed the defendant it had lost the evidence.
 

 On appeal of his conviction, the Fifth Circuit rejected the defendant’s argument
 
 *170
 
 that he suffered prejudice warranting reversal of his conviction because of his inability to independently test the cocaine evidence. The appeal court noted that the defendant had notice of the testing of the evidence and its results by July 18, 2000, the date on which the minute entry indicated that the defendant had |32received a response to his discovery motions. During the next three years, the defendant never requested the evidence in order to independently test it. Rather, he waited until the morning of trial to make such request. The court noted that at some time, the evidence may have still been available, and that the defendant should have taken adequate steps prior to the morning of trial to develop his defense. The court further noted that defense counsel thoroughly cross-examined the State’s forensic expert regarding the margin of error in the testing process.
 

 In this case, unlike
 
 Clark, Tuesno,
 
 and
 
 Frazier, supra,
 
 the evidence was not lost, tainted, consumed, or otherwise rendered unsuitable for testing through any action of the State. The evidence herein was indisputably preserved intact until Hurricane Katrina struck. Furthermore, the defendant does not allege that he was denied the ability to test the State’s forensic experts concerning the reliability of the testing used or the results of that testing on his underwear, t-shirt and jean shorts. Accordingly, as previously noted herein, in the absence of such an allegation, “the unavailability of the evidence for further testing does not in itself so prejudice defendant’s right to a fair trial.”
 
 Clark,
 
 414 So.2d at 741.
 

 Additionally, the record reveals that defense counsel thoroughly cross-examined Joseph Tafaro and Anne Montgomery regarding their fitness to be qualified as experts in their respective fields, and also in an attempt to impeach their analysis of the defendant’s clothing. The record evidences that the defendant had two years from his indictment on July 31, 2003, until Hurricane Katrina struck within which to have the evidence independently tested. However, it was not until March 6, 2007, that the defendant’s first motion for discovery relative to DNA or serological testing was filed. The record simply does not evidence that the defendant attempted to have his clothing tested prior to Hurricane Katrina, despite |aahis motion to suppress the clothing evidence having been litigated and denied on September 4, 2004. Therefore, we must conclude that the defendant has made no showing that his right to a fair trial was prejudiced by his inability to independently test his jean shorts, underwear and t-shirt.
 

 With respect to the second component of this assignment or error, this Court has set forth the appropriate standard of review when considering a claim of defect in the chain of custody:
 

 [A] lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than its admissibility.
 
 State v. Sam,
 
 412 So.2d 1082, 1086 (La.1982);
 
 State v. Alexander,
 
 621 So.2d 861, 864 (La.App. 5 Cir.), writ granted and case remanded for resentencing, 629 So.2d 376 (La.1993).
 

 State v. Merrill,
 
 94-0716, p. 9 (La.App. 4 Cir. 1/31/95), 650 So.2d 793, 799.
 

 Accordingly, in order to introduce demonstrative evidence at trial, the law requires that the object be identified. This identification may be visual (ie., by testimony at the trial that the object exhibited is the one related to the case) or it may be by chain of custody
 
 (ie.,
 
 by establishing the custody of the object from the time it was seized to the time it was offered in evidence).
 
 State v. Sweeney,
 
 443 So.2d 522, 528 (La.1983).
 

 
 *171
 
 Evidence as to custody must not eliminate all possibility that the object has been altered; rather, for admission, it suffices that it is more probable than not that the object is the one connected to the case.
 
 State v. Frey,
 
 568 So.2d 576, 578 (La.App. 4 Cir.1990).
 
 See also State v. Lewis,
 
 97-2854 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004;
 
 State v. Borne,
 
 96-1130 (La.App. 4 Cir. 3/19/97), 691 So.2d 1281. The trial court is vested with great discretion when determining whether a party has laid a proper foundation for the introduction of evidence.
 
 Lewis, supra.
 

 IsJn this case, Detective Michael Sam testified that he was present at Central Lockup and physically observed the defendant undress and surrender his jeans, socks, t-shirt and underwear to Sheriffs deputies, who in turn placed the clothing into a single clear plastic bag. Detective Sam also testified that he observed stains on the defendant’s underwear. After the defendant’s clothing was obtained, Detectives Michael Sam and Andre Giles confiscated the clothing and transported it to CEP in the plastic bag. Detective Sam witnessed Detective Giles log the clothing into CEP. Neither Detective Sam nor Detective Giles returned to CEP to submit additional evidence on May 25. Detective Sam identified a copy of the evidence receipt for the clothing which contained the same item number assigned to this investigation and testified that the receipt incorrectly indicated that the defendant’s underwear was submitted to CEP on May 25, rather than on May 24, which was when the clothing was confiscated from the defendant and placed in CEP by him and Detective Giles.
 

 Additionally, Detective Giles corroborated Detective Sam’s testimony regarding the confiscation of the defendant’s clothing. Detective Giles added that at no time did he open the bag or add or remove items from it; he inadvertently failed to list the underwear on the evidence card when he submitted it to CEP. Thus, the underwear was submitted, but simply not logged in, on May 24. When Detective Giles learned from Detective Waguespack that the underwear was in the plastic bag with the other items, he realized that he had not included it on the evidence card submitted with the clothing, and returned to CEP on May 25 and filled out another evidence receipt listing the underwear with the other evidence already logged in accordingly, as NOPD regulations required him to fill out a new receipt with a new number even though no evidence in the plastic bag had been [.^disturbed. Finally, Detective Giles also explained that the original evidence receipt incorrectly listed the confiscation time of the clothing as on May 24 at 3:15 p.m., when in fact the clothing was confiscated at 3:45 a.m., and attributed these discrepancies to human error.
 

 The record evidences that Lieutenant Monteverde confirmed Detective Giles’ explanation of the logging in process in this case, as he confirmed that when evidence is logged in a receipt is generated and each piece of evidence is assigned a sequential barcode. Thus, if a receipt fails to list a piece of evidence, that receipt cannot be updated because each receipt number is unique. Instead, a new receipt with a new number must be generated listing the correct evidence. When this occurs, the newly updated receipt is given a barcode that is out of sequence to the original receipt.
 

 Additionally, Joseph Tafaro identified the inventory of the defendant’s clothing, including the underwear that came to him for testing, which arrived in two separate paper bags. When he completed his analysis, Mr. Tafaro repackaged the items for resubmission to the CEP for further test
 
 *172
 
 ing by the DNA lab. Additionally, Ms. Anne Montgomery recounted from her lab report that the sample cut outs of the defendant’s clothing she received for DNA testing matched the barcodes assigned by CEP. She said the items were received for testing on June 17, 2003, at 11:15 a.m., stored in a freezer pending testing and then returned to CEP after testing on July 9, 2003.
 

 Considering the record in its entirety, we find that the State established the chain of custody of the evidence through the testimony of its witnesses. To the extent there were any discrepancies as to the date and time the articles of clothing were confiscated and logged in at CEP, the jury was not unreasonable in accepting |SfiDetective Giles’ explanation of human error and in concluding that it was more probable than not that the evidence as identified at trial was in fact connected to this case.
 

 CONCLUSION
 

 For the foregoing reasons, Defendant’s conviction and sentence are hereby affirmed.
 

 AFFIRMED.
 

 [1]
 

 . The test confirmed that Brandy's blood type was "B”.
 

 [2]
 

 . Ms. Annie Lockett, a supervisor of the NOPD 911 Communications Center, explained to the jury the procedure for processing 911 calls. When a call comes in, information is obtained from the caller, entered into the computer system and given an Incident Recall number. All calls are recorded and stored so that they can be retrieved at any time. Ms. Lockett identified the transcription of the 911 call received in this case at 12:42 a.m. on May 24, 2003. The audio of the call was played for the jury.
 

 [3]
 

 . Officer Sam testified that he did not recall seeing a white cup containing six cigarette butts among the evidence logged in by Detective Giles.
 

 [4]
 

 . He denied ever removing any of the clothing from the bag and denied placing stains on the defendant's underwear.
 

 [5]
 

 . Defense counsel stipulated as to Ms. Montgomery’s expertise in molecular biology and DNA forensic analysis.
 

 [6]
 

 . Ms. Montgomery testified that the analysis was performed at the NOPD crime lab, which had been certified as compliant with the FBI's quality assurance standards.
 

 [7]
 

 .Although the frequency calculation is first transcribed as one in ten million, it is thereafter consistently quoted as one in ten billion.
 

 [8]
 

 . Likewise, other circuits have upheld a trial court’s designation of an expert witness with similar fact patterns. For example, in
 
 State v. Small,
 
 29,137 (La.App. 2 Cir. 4/2/97), 693 So.2d 180, the designation of the State’s crim-inalist as an expert witness was upheld by the Supreme Court. The witness testified that she was the supervisor of the serology and DNA section at the Northwest Louisiana Crime Lab, which position she had held for five years. She stated that she had a bachelor’s degree in biology and had qualified as an expert in serology approximately fifty times and in DNA analysis on ten occasions. In
 
 State v. Collins,
 
 32,409 (La.App. 2 Cir. 9/22/99), 763 So.2d 618, the State's expert witness testified that she was a forensic scientist at the North Louisiana Criminalistics Laboratory, where she had been employed since May 1997. She had been employed for three years in the private sector for a laboratory which performed forensic science testing for criminal laboratories that were not equipped to perform their own testing. Her primary responsibility was conducting DNA testing on items of evidence containing biological fluids. She testified that she had a Bachelor of Science degree in applied biology and a Master of Science degree in forensic science. Finally, she had been qualified as an expert witness in the fields of forensic DNA analysis and molecular biology in the Caddo Parish and Rapides Parish courts. The Second Circuit found no abuse in the trial judge's recognition of the State’s witness as an expert in serology. Finally, in
 
 State v. Williams,
 
 458 So.2d 1315 (La.App. 1 Cir.1984) the First Circuit found no error in the trial court's qualifying a witness as an expert in the field of serology where that witness had a bachelor of science degree in zoology; had attended a university forensics serology course; was a member of the Louisiana Association of Forensic Scientists and had attended seminars hosted by that organization; and was employed as a serologist by the Louisiana State Police crime lab for approximately six years.