EDWIN A. LOMBARD, Judge.
I,The Appellant, Defendant Troy Taylor, seeks review of convictions for forcible rape, Count One, a violation of La. R.S. 14:42.1, and second degree kidnapping, Count Two, a violation of La. R.S. 14:44.1, and his sentences. Finding that the district court erred in denying in part Taylor’s motion for new trial, we reverse his conviction and sentence for Count Two, second degree kidnapping. In all other respects, we affirm Taylor’s conviction and sentence for forcible rape, Count One, reserving unto Taylor his right to raise the issue of the expiration of the time limitation for the institution of prosecution as to that count, including the issue of the alleged ex post facto violation, on application for post conviction relief.
STATEMENT OF THE CASE
Taylor was charged by bill of information on January 13, 2011, in Count One with forcible vaginal rape, a violation of La. R.S. 14:42.1; in Count Two with second degree kidnapping, a violation of La. R.S. 14:44.1; and in Count Three with aggravated crime against nature, a violation of La. R.S. 14:89.1. Taylor pleaded not guilty at his January 18, 2011 arraignment. The district court later denied | gTaylor’s: motion to suppress evidence, motion to quash, and motion to continue the trial. Taylor sought review in this court of the denial of his motion to continue and, initially, we issued a stay of proceedings, but later lifted the stay and denied the writ.[1] On August 22, 2011, the first day of trial, the State nolle prosequied Count Three, the charge of aggravated crime against nature. At the conclusion of a three-day jury trial, the twelve-person jury found Taylor guilty as charged as to Counts One and Two.
On September 22, 2011, the district court denied Taylor’s motions for a new trial, in arrest of judgment, and for post-verdict judgment of acquittal. Taylor expressly waived the twenty-four hour delay between those denials and sentencing. The district court sentenced him to forty years at hard labor on both counts with both sentences to run concurrently and to be served without benefit of probation, parole, or suspension of sentence. Taylor filed a motion for appeal that date, which was granted. Taylor filed both a counseled brief and a pro se brief in our Court.
FACTS
Taylor was tried and convicted in 2011 for the 1994 forcible rape and second degree kidnapping of the victim, S.B.
New Orleans Police Department (“NOPD”) 911 Division Supervisor Gesielle *70 Roussel, who was employed with the 911 Division in 1994, identified State Exhibit 1 as an incident recall under Item # H-50397-94, which was dated August 30, 1994, and concerned a possible aggravated rape at 2932 Desire | ¡¿Parkway, Apartment D. The call was made at 5:02 a.m., according to Supervisor Roussel.
NOPD Detective Keenan Shields investigated the August 30, 1994 assault of victim S.B. He testified that she was crying and upset when he met with her at 2932 Desire Street. He further testified that she was later able to describe her assailant as a black man named Troy with a curly top, Afro hairstyle, who was driving a four-door burgundy colored car. Det. Shields explained that the victim had been unable to do a composite sketch because she was very distraught and upset at what had happened. Det. Shields testified that he did not compile a photographic lineup because he did not have enough information. Det. Shields also explained that he attempted to have a composite sketch of the suspect done, but he said he did not think the victim was able to put one together at that time.
Detective Shields further testified that he transported the victim to the hospital for a sexual assault examination. He collected the rape kit and took it to the Central Evidence and Property room. Det. Shields identified State Exhibit 2 as the evidence and property card, under Item # H-50397-94, reflecting his submission of the rape kit, as well as the victim’s underwear and blue jean cut off shorts.
NOPD Detective Merrell Merricks had been assigned to the sex crimes division approximately four years at the time of trial. He testified that at some point the NOPD received a letter from the Louisiana State Police (“LSP”) notifying it that a “CODIS” (Combined DNA Index System) hit was made on a 1994 case under Item # H-53397-94, leading to Taylor’s identification as a suspect. |4Pet. Merricks testified that he found the victim, S.B., who was living outside the state, and she informed him that she was willing to pursue the case. Det. Merricks obtained an arrest warrant for Taylor. He subsequently obtained two buccal swabs from the inside of Taylor’s mouth, which were sent to the LSP for analysis/comparison. Det. Mer-ricks testified that he never presented S.B. with a photo lineup containing Taylor’s photo.
Sgt. Justin Kennedy[2] testified that he arrested Taylor in Houston, Texas, in 2006. He testified that he responded to a call at approximately 3:30 a.m. When he arrived at the scene he was flagged down by the individual who called in the complaint. He was directed to a Jeep Cherokee vehicle in a parking lot, whereupon he observed a struggle between Taylor in the driver’s seat, and a woman in the passenger seat, E.C. Sgt. Taylor testified that Taylor’s penis was exposed and he was wearing jeans. He explained that E.C.’s overall appearance was someone who was distraught and who had been through a panic state. Taylor was arrested. Sgt. Kennedy identified Taylor in court.
E.C. testified that she was living in Houston, Texas, on February 16, 2006, when she got into a physical fight with her boyfriend, who put her out of his home. As she walked down the street late that night crying, Taylor approached her, while driving a black Jeep Cherokee, and asked if she was okay. She testified that Taylor offered her a ride, which she accepted.
*71 | ¿She further testified that after she entered the vehicle, Taylor told her that if he was going to give her a ride he wanted to have sex with her and he pulled into the parking lot of an apartment complex. She said, “Okay. Don’t hurt me.” Once inside the parking lot, Taylor told her she was going to have intercourse with him and perform oral sex on him or he was going to kill her. She testified that Taylor began taking off her clothes and made her get into the back seat where he attempted to force her head down as her told her to perform oral sex on him. He tried to turn her over, and she was able to maneuver into the front passenger seat and jump out of the car. However, she testified that Taylor followed and grabbed her, pulling her head back and threatening to kill her. She screamed for help and for someone to call the police. Taylor then dragged her back inside the vehicle just before the police pulled up. She testified that she and Taylor were in the front seat of the vehicle when the police came. The police questioned her about what had happened and later dropped her off at her sister’s residence.
Christine Slack testified that she was working one night at a Shell gas station on January 20, 2004, when Taylor exposed his penis to her when she opened the payment drawer. Furthermore, retired NOPD Officer Michael Melton testified that on February 2, 2004, he arrested Taylor for lewd conduct at a Shell gas station on Chef Menteur Highway.
David Benado, M.D., who was qualified by the court as an expert in the field of emergency medicine, testified that he was working an emergency room rotation in Charity Hospital in New Orleans on August 30, 1994, when he examined S.B. |fiHe identified State Exhibit 6 as a form accompanying a sexual assault kit, which identified S.B. as the patient. Dr. Benado identified his signature on the document as the physician’s signature, which was dated August 30, 1994, at “4:00 p.m.”. He testified that the history given by the victim was intercourse, with a time given of 3:15 a.m. and that the type of sexual contact was checked off as genital and oral. A physical examination of S.B. revealed, according to the report, no evidence of alcohol or drugs. He further testified that there was no evidence of trauma to S.B.’s genital or rectal areas, although a vaginal abrasion consistent with intercourse was present. Dr. Benado also found an abrasion and small hematoma/bruising at the back of the victim’s throat which was consistent with oral intercourse, but not consistent with ordinary oral intercourse in a loving relationship. He confirmed that the injuries sustained to S.B.’s pelvic area and mouth were consistent with the history provided by her. S.B. was given one dose of a drug for gonorrhea and a seven day course of medication for chlamydia. He explained that, based on the medical record, the victim did not say who assaulted her; however, he also said it was not standard practice to ask.
He additionally testified that he found no sperm present in the exam. He testified that vaginal swabs were all placed back into the sexual assault kit box, which was then sealed. He testified that he and the nurse signed the box, which stayed with the nurse until it was picked up. He clarified that the nurse was the liaison from the time a police officer dropped off the kit until the officer picked it up.
|7S.B. testified that on August 30, 1994, when she was approximately eighteen years old, she and a friend went to “ladies night” at Club Rumors on St. Claude Avenue. Once at the club her friend left her, saying she was coming back, but she never did. S.B. testified that she left the club and began walking home because she had *72 no money. At that time S.B. was living with her sister, R., on Desire St. in Orleans Parish. She estimated that it was 1:00 or 2:00 a.m. when she was walking home.
She further testified that she walking along St. Claude Avenue to Desire St., where she turned and continued to walk home. As she was walking down Desire St., two males drove up alongside her and one of them, who told her his name was “Troy,” talked to her. She did not respond, but she said he was talking nicely to her. S.B. testified that the two males drove off, and “Troy” later returned alone. He asked her if she wanted a ride, and she accepted the offer and entered his car. “Troy” drove down Desire Street, but locked the car doors from the driver’s side and turned off of Desire Street. She testified that she asked him why he turned off, and he told her to shut up. She got scared and did not say anything. He drove to an area, under an overpass with no houses nearby, and parked. He then proceeded to unzip his trousers, take his penis out, and pushed her head toward it. She testified that she was forced to perform oral sex on him. He then told her to climb into the back seat and ordered her to take off her shorts. S.B. testified that she did get in the back seat and took one leg out of her pants and underwear. Thereafter, “Troy” put his penis inside of her.
|8S.B. testified that she was scared for her life and thought Taylor would do something to her, like kill her. She testified that the fact he had been so nice and his demeanor suddenly changed after she got into his car really frightened her. After he raped her, she asked him why he did that to her, but Taylor did not answer. She testified that he did not use a condom, but she could not tell if he had ejaculated. She got out of the back seat and into the front seat. He drove up Florida Avenue to where he was supposed to drop her off, and let her out at a traffic light. She testified that she ran home scared and crying.
She testified that she told her sister, R., that she had been raped. R. telephoned another sister, D.B., who telephoned the police. The police arrived and questioned her, and she went to the hospital for an examination. She further testified that the only description of the individual that she gave to police was that her assailant was a dark-skinned man with a curly-top hairstyle named Troy. She was never able to do a drawing of the person.
Patricia Daniels, who is the retired head of the pathology lab at the Orleans Parish Coroner’s Office, was qualified by the district court as an expert in the field of forensic serology — the study of bodily fluids, including seminal fluid, blood, and saliva. She did all the analyses of items collected at the hospital during rape examinations. She did the testing at the NOPD’s crime lab, and she said the rape kits came through NOPD Central Evidence and Property. She testified that she received the rape kit in S.B.’s case and identified State Exhibit 8 as her lab report prepared after examining the items in S.B.’s rape kit. Internal and external vaginal Igswabs were positive for seminal fluids, and slides containing seminal fluid were positive for spermatozoa. The oral swabs were negative for spermatozoa and active blood in the smooth tissue.
Ms. Daniels testified that in the performance of her job she worked in her lab at the coroner’s office in the morning and went to the NOPD crime lab in the afternoon. She explained that the police would bring the rape kits from Central Evidence and Property to the crime lab, and they would be waiting at her station when she got there in the afternoon. She testified that she did not sign an evidence inventory *73 sheet or anything like that to signify her receipt of the rape kits. She further explained that the criminalist in the crime lab would go to Central Evidence and Property, pick up whatever was there, bring it to the crime lab, and put it at her station.
Anne Montgomery, who was qualified by the district court as an expert in the field of molecular biology and DNA analysis, testified that she was employed as the DNA Technical Leader for the NOPD Crime Lab from 2001-2006 and had been rehired in that position in October 2010. She testified that she was a consultant whose area of expertise was forensic DNA, a field she has been involved in since 1990. She testified that she has been conducting DNA analyses for over twenty years, and estimated she had conducted thousands of DNA tests over that period of time and testified in excess of a hundred times for both the prosecution and the defense.
|inMs. Montgomery explained the hierarchy of the DNA databases as follows, all falling under CODIS (Combined DNA Index System): NDIS (National DNA Index System) -» SDIS (State DNA Index System) -* LDIS (Local DNA Index System). She said the NOPD Crime Lab was a LDIS, and the LSP Crime Lab in Baton Rouge was the SDIS — there is only one SDIS per state. She explained that approximately once a week an LDIS would upload its DNA data into the SDIS database, and in turn approximately once a week an SDIS would upload its DNA data into the NDIS database.
Ms. Montgomery testified that in approximately 2003, the federal government provided grant money for local agencies to process backlogged evidence for DNA profiles. She explained that because of limited manpower the NOPD outsourced rape kits to accredited private laboratories to develop the DNA profiles. She testified to the rules concerning this process, with the LDIS having to do an onsite inspection of the private lab and audit its records. The LDIS had to do a complete one hundred percent review of the all the documentation from the beginning of the private lab’s work to the end prior to entering the DNA profiles into the LDIS database and uploading them into the SDIS database.
Ms. Montgomery further testified that, while working with the NOPD in 2003 or 2004, she learned of a batch of rape/sexual assault kits from 1987 to 2003, that had been screened by the coroner’s office as sperm positive, but which were being stored, with nothing further being done with them. Grant money was secured, and she estimated that seven to eight hundred sperm positive samples 111were outsourced for DNA profiling. A majority of the DNA profiles generated by this private lab testing was uploaded into CODIS in the “unknown” forensic evidence database.
Ms. Montgomery identified State Exhibit 9, a copy of the case file under Item # H-50397-94. She stated that it was a typical example of the amount of documentation involved in each and every case that is outsourced as part of the backlogged-evidence DNA profiling project. She stated generally that in the case a sample was sent to the outsourced lab, which ran a profile and sent back documentation to the NOPD Crime Lab, which reviewed the documentation and found the profile suitable for upload. It was then uploaded into CODIS in 2006. In late 2008, they were notified at the NDIS level that a hit had occurred with the unknown male DNA profile under NOPD Item # H-50397-94 against a known reference sample from Texas.
State Exhibit 10 is a two-sided document. Ms. Montgomery identified one side of State Exhibit 10 as an undated chain of custody document the NOPD *74 Crime Lab generated when it assigned a unique sample number to the evidence sample (one microfuge tube containing one vaginal swab), N02144, and the reference sample from the victim (one microfuge tube containing reference whole blood from the victim), N02145. The sample numbers were categorized under NOPD Item # H-50397-94. The other side of State Exhibit 10, was identified by Ms. Montgomery as an internal chain of custody document from Reliagene Technologies (“Reliagene”), an accredited lab in New Orleans. On the back of the | ^document, in the top-left-hand corner, is a date, February 15, 2005, and the signature of an individual named James Melton, signifying Reliagene documenting what it had received. Ms. Montgomery believed James Melton was a technician at Reliagene, but she did not know him. At the bottom of the document was the date May 4, 2005, when it was given back to James Melton.
State Exhibit 11 was a copy of the chain of custody document reflecting NOPD Crime Lab personnel going to NOPD Central Evidence and Property room to retrieve the samples and take them to the crime lab. Ms. Montgomery testified that it documented the item number, the date and time the evidence was retrieved, who retrieved it, and that it was stored in the evidence freezer in the lab. Ms. Montgomery also testified that State Exhibit 11 reflected that August 28, 2004, was the date the crime lab received the evidence from the NOPD central property and evidence room. She testified that between that date, August 28, 2004, and February 15, 2005, the date State Exhibit 10 reflected that Reliagene received the evidence, it was in the freezer in the crime lab — based on State Exhibit 11 saying that an individual named Jennifer Schroeder securely stored it in the evidence freezer on that date on August 28, 2004, at 12:44 p.m. She did not have a document showing that the NOPD central property and evidence room signed out the evidence to Jennifer Schroeder on August 28, 2004.
State Exhibit 12 was a copy of the report from Reliagene submitted to the NOPD crime lab in the instant ease. It reflected that 11sone vaginal tube containing one vaginal swab and one victim reference blood stain card was hand-delivered by Ms. Montgomery on February 15, 2005.
Ms. Montgomery testified that when the NOPD crime lab receives a DNA profile report from a private lab, it uses the raw data to independently make a DNA profile assessment to compare it with the results from the private lab. In the instant case, three DNA profiles were generated: 1) a single source female profile was generated from the victim’s reference sample.; 2) the epithelial fraction from the vaginal swab generated a profile consistent with a mixture of alleles, mostly consistent with the victim’s reference profile, but also some minor ones consistent with the sperm donor, and 3) the sperm fraction derived from the vaginal swab generated a male DNA profile. Ms. Montgomery testified that she saw one weak allele which was consistent with the victim. She explained that, depending on the ratio of epithelial cells to the sperm cells, there might be some spillover of the DNA into each of those fractions — the victim’s and the male’s.
Ms. Montgomery identified State Exhibit 13 as a copy of the stain card representing S.B.’s reference blood sample. She explained that the blood when received was in a small tube, but that to insure its preservation prior to outsourcing, stain cards (a blood spot on a card) were made because these could be stored at room temperature instead of having to be stored in a freezer. State Exhibit 14 consisted of two pages, the first one being an “NOPD *75 Outsourced Data Review Checklist” detailing a checklist the lab had for each case that was outsourced. The second page of State Exhibit 14 was also related to the outsourced DNA worR]^verifying that the documents received back were reviewed; that the DNA profiles correct; and that the data was uploaded. State Exhibit 15 was a copy of a Reliagene forensic checklist, with a copy of a UPS tracking label addressed to Ms. Montgomery in care of the NOPD crime lab.
Ms. Montgomery also identified State Exhibit 16, a copy of an October 6, 2008 printout of a National Match Detail Report by which the NOPD was first notified of the then unknown male DNA profile being matched to a known offender in Texas. Ms. Montgomery testified that during post-Hurricane Katrina flooding the outsourced data files were damaged, but they knew they could go back to the vendor lab and ask for that documentation again. She testified that to the best of her knowledge, evidence that was at the lab was returned to the NOPD evidence and property room prior to Hurricane Katrina, and the crime lab had no evidence there when the hurricane struck.
Lastly, Ms. Montgomery testified that the single male DNA profile found by Re-liagene showed a single source male donor in the evidence processed. She described the results in detail. Ms. Montgomery also detailed the several confirmations of the DNA results in the case. First, she explained that, once the hit in the CODIS systems occurred, Texas was obligated to go back to its sample, re-extract it, return it, and confirm that profile was indeed correct. Second, the NOPD crime lab obtained an independent sample from Taylor and retested that reference sample. Third, a confirmation test was performed by the LSP crime lab, in which it extracted DNA from a known reference sample from Taylor and compared it |1fiagainst the NOPD crime lab profile, as evidenced by State Exhibit 18, which Ms. Montgomery identified.
Alexis Brown, who was qualified by the district court as an expert in the field of molecular biology and DNA analysis, had been a quality control officer and DNA analyst for Reliagene. She detailed the processing procedure used in the instant case:
• first, some of the sample is taken and put on a slide to see how many sperm were present and recording information as to the epithelial cells seen;
• DNA was then extracted from the epithelial cells obtaining an epithelial fraction, and
• DNA was then extracted from the sperm fraction.
In this particular case, Ms. Brown testified that thirteen different fragments of DNA were examined. She testified that the final process was to detect the DNA fragments, which was done using a machine which generates data from which is generated a DNA profile, and a report is written. Ms. Brown identified State Exhibit 12 as a report she prepared. She also identified State Exhibit 19 as a portion of a chain of custody document reflecting the delivery to Reliagene by Anne Montgomery of a vaginal swab (sample 2144) and a blood stain card from the victim (sample 2145). Ms. Brown testified that once Re-liagene completed its testing it provides the case file to the NOPD. The case files include the report, the DNA profile table it created, all the raw data, and worksheets it used in the laboratory for processing the samples.
|1fiMs. Brown further testified that chain of custody documentation shows who has the evidence and when. She did not run the DNA tests in the instant case; however, a former analyst, Tara Johnson, did *76 perform the DNA testing. Ms. Brown testified that Ms. Johnson did not actually handle the evidence, but only handled the work product derived from the evidence in doing her DNA analysis. Thus, Ms. Johnson was not noted in the chain of custody.
Lastly, Ms. Brown testified, as had Anne Montgomery, that in initially submitting the two samples/pieces of evidence in the case to Reliagene, the NOPD incorrectly described the victim’s reference sample as a tube of whole blood, when in fact what Reliagene received as the victim’s reference sample was a bloodstained card.
LSP Crime Lab forensic scientist Angela Delatte, who was qualified by the district court as an expert in the field of molecular biology and forensic DNA analysis, identified State Exhibit 18 as her report in connection with the analysis of a reference buccal swab taken from Taylor. Two reference buccal swabs in a brown envelope, identified by her as State Exhibit 5, were received by the State Police lab on December 7, 2010. With that envelope the LSP lab also received a report from Reliagene, which she identified as State Exhibit 9. She testified that she compared the DNA profile she obtained from the reference buccal swab from Taylor to the male DNA profile conclusions in the Reliagene report as to the sperm fraction of the vaginal swab. She testified — as to the DNA profile obtained from Taylor’s reference buccal swab matching the male DNA profile obtained from the |17sperm factor derived from the vaginal swab taken from the victim — that the probability of finding the same duplicate male DNA profile from an unrelated, unknown, individual other than Taylor was one in six hundred thirty-eight trillion.
ERRORS PATENT
Our review of the record reveals there are no errors patent.
ASSIGNMENTS OF ERROR
Taylor raises three assignments of error through his appellate counsel as well as two pro se assignments of error:
1. The district court erred in granting the State’s challenge for cause as to one prospective juror;
2. The district court erred in denying defendant’s motion for new trial, and 8. The district court erred in denying defendant’s motion for post-verdict judgment of acquittal.
Additionally, Taylor raises two (2) pro se assignments of error:
1. The district court erred in permitting the prosecution of procedurally barred offenses, via application of an ex post facto “violatile” law.
2. The district court erred in denying Taylor’s motion for post verdict judgment of acquittal, when the evidence was insufficient to support his conviction.

THIRD ASSIGNMENT OF ERROR AND PRO SE ASSIGNMENT OF ERROR NUMBER TWO

First, we address the Appellants third counseled assignment of error and his second pro se assignment of error jointly as both of these assignments of error question the sufficiency of the evidence. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing 11scourt should first determine the sufficiency of the evidence. State v. Marcantel, 00-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55 (citing State v. Hearold, 603 So.2d 731, 734 (La.1992)) [emphasis added].
In his third counseled assignment of error, Taylor argues that the district court erred in failing to grant his motion for post-verdict judgment of acquittal, which was based on the ground that the evidence was insufficient to support his conviction.
*77 Article 821(B) of the Louisiana Code of Criminal Procedure states that a post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the prosecution, does not reasonably permit a finding of guilty. A motion for post verdict judgment of acquittal raises the question of the sufficiency of the evidence. State v. Hampton, p. 12 (La.4/23/99), 750 So.2d 867, 880.
Our Court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckabay, 00-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact 11flfinder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Id., 00-1082, p. 32, 809 So.2d at 1111 (quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-107).
The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Wells, 10-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 09-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996. Additionally, when a key issue is the defendant’s identity as the perpetrator, the State is required to negate any reasonable probability of misidentification. State v. Weary, 03-3067, p. 18 (La.4/24/06), 931 So.2d 297, 311; State v. Galle, 11-0930, p. 31 (La.App. 4 Cir. 2/13/13), 107 So.3d 916, 935.
*78 12(lIn the instant case, Taylor argues that the evidence was insufficient to establish his identity as the perpetrator of either the crime of forcible rape or of second degree kidnapping.
Pursuant to our review of the record, we note that S.B. never identified him as the person who enticed her into his car with a promise of a ride and/or assaulted her. Furthermore, she was unable to provide information to help the police develop a composite picture of the man. However, she did tell police on the day of the assault that the individual who assaulted her told her his name was “Troy.” Defendant’s name is Troy Taylor. Additionally, as previously noted, LSP Crime Lab forensic DNA expert Angela Delatte testified that the DNA profile obtained at the LSP crime lab from the reference buccal swab taken from Taylor after his 2010 arrest matched the male DNA profile obtained by Reliagene from the sperm faction of the vaginal swab, which was taken from S.B. on August 30, 1994, the day she was allegedly assaulted. Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant Troy Taylor was the “Troy” who kidnapped and assaulted the victim.
Regarding Taylor’s second pro se assignment of error directed to the sufficiency of the evidence, he argues that the evidence was insufficient to support his conviction of forcible rape as to the elements of that offense.
Forcible rape is defined by La. R.S. 14:42.1(A), in pertinent part, as a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
|2i(l) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
In the instant case, Taylor had nicely offered the eighteen-year old victim a ride, then changed his demeanor after she entered his car. He locked the car doors. When she asked him why he turned off the street leading to her sister’s home, where he was supposed to be taking her, he told her to “shut up.” She got scared at that point. Then he drove to an isolated urban area underneath an overpass, parked, pulled out his penis, and pushed her head down toward it. She said she was scared for her life and thought defendant might harm or kill her. There was no evidence that Taylor expressly told her to perform oral sex on him; however, when asked on direct examination what Taylor made her do, she said he made her suck his penis. The most forceful act by Taylor in the instant case was his act of pushing the victim’s head down toward his exposed penis. Taylor then directed her to get into the back seat and remove her shorts, and after she removed one leg from her shorts and underwear, defendant had intercourse with her. She testified that she was scared for her life and thought Taylor would do something to her, like kill her. Afterward the victim asked him why he had done it, clearly reflecting the victim’s state of mind that she had not consented to the sexual activity.
As noted above, Dr. Benado, who performed the sexual assault examination on the victim on the same day she was allegedly assaulted, testified that there was no evidence of trauma to the victim’s genital or rectal areas, although a vaginal abrasion consistent with intercourse was present. However, Dr. Benado also found an abrasion and small hematoma/bruising at the back of the victim’s throat which was con *79 sistent with oral intercourse, but which he stated |i.j>was inconsistent with ordinary oral intercourse in a loving relationship.
In State v. Armstead, 11-1344 (La.App. 4 Cir. 7/25/12), 98 So.3d 891, we found the following evidence constitutionally sufficient to support the defendant’s conviction for forcible rape. The victim, who was the defendant’s sister and was “reportedly mentally challenged,” attended a party at someone else’s residence with defendant and another sister. When the defendant and the victim were alone in a bedroom at the residence, the defendant locked the bedroom door and asked the victim to perform oral sex on him, and she verbally refused. The victim testified that the defendant then “shoved [his penis] in [her] mouth” then asked that she bend over, at which time he had anal sex with her. The victim testified that she “got scared” and just did it. She said she did not call out for help because she “was scared” and “in shock.” She also did not believe that anyone would have heard her had she called for help, as the music at the party was loud.
In Armstead, we explained that “[o]ur jurisprudence clearly establishes that the testimony of a victim, alone, is sufficient to establish the elements of the offense of forcible rape, even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant.” Id., 11-1344, p. 4, 98 So.3d at 894 (citing State v. Lewis, 97-2854 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004, 1023). We further expounded that the victim testified that she was “in shock” and “scared” when the defendant forced her to perform oral sex and then had anal sex with her. Id., 11-1344, p. 5, 98 So.3d at 894. Additionally, the presence of seminal fluid on the victim’s clothing further corroborated her testimony. Id., 11-1344, p. 5, 98 So.3d at 894-95.
12,-jThe facts in the instant case are somewhat similar to those in Armstead, insofar as establishing the elements of forcible rape, but the facts in the instant case are more compelling given the circumstances — the early morning hours, the isolated location underneath an overpass where defendant took the victim, and that he told her to “shut up” when she asked why he had deviated from the route to her sister’s residence. While the defendant in the instant case did not actually shove his penis in his victim’s mouth, only “pushed” her head down toward his penis, viewing all the evidence in the instant case in a light most favorable to the prosecution, any rational trier of fact could have concluded that the victim was prevented from resisting the rape by “implied” threats of physical violence under circumstances where the victim reasonably believed such resistance would not prevent the rape. For the foregoing reasons, we find that there is no merit to the claims made by appellate counsel or Taylor pro se that the evidence was insufficient to sustain his convictions.
FIRST ASSIGNMENT OF ERROR
In his first counseled assignment of error, Taylor argues that the district court erred in granting the State’s challenge for cause as to prospective juror Horne.
During voir dire, in response to a question as to whether he, a member of his family, or a friend had ever been the victim of a crime, Mr. Horne volunteered that he once had been charged with attempted rape. He explained that the charge was eventually dropped, but that he was held in custody for ninety days. Later, during defense counsel’s questioning of the voir dire panel, counsel hypothesized that if counsel’s own mother was serving as a *80 potential juror she would believe that a ^defendant on trial did something wrong, even if he or she was actually innocent of the crime charged. Defense counsel asked if anyone felt the same way as his mother, and Mr. Horne stated:
I had a charge, and they was [sic] saying I did something wrong and I didn’t. When somebody comes in court, I feel like I did something wrong. And I know I ain’t [sic] did it. I think, like, other people feel the same way.
Additionally, during questioning concerning the State’s burden of proof as to identification, defense counsel talked of eyewitness identification, concluding with the statement: “The eyewitness ID may not be reliable, correct?” Mr. Horne replied: “Right.” Defense counsel spoke more particularly about the instant case— giving an example of the victim saying for seventeen years that she did not know who did it, unable to point her attacker out in a photographic lineup or draw a composite sketch of him, but then at trial saying that she remembered her attacker — and asked Mr. Horne: “That might not be a reliable ID, right?” Mr. Horne replied: “No.”
At the challenge conference for that panel, the State challenged Mr. Horne for cause because he stated that he was once charged with Attempted Rape and stated that he would be thinking about his “experience because someone charged me.” Defense counsel argued that Mr. Horne never said he would be unfair and that he definitely could not be struck for cause. The district court explained that according to its own notes, Mr. Horne has indicated that he could not serve.
We note that the record does not reflect that, prior to the challenge conference, Mr. Horne ever stated that he would be thinking about his experience because of what happened to him, as represented by the prosecutor; that he indicated he could not serve, as represented by the trial court; or that he could bej^fair, as represented by defense counsel — although defense counsel correctly represented that Mr. Horne never said he could not be fair.
The district court subsequently called Mr. Horne into chambers for questioning, as reflected by the following colloquy:
THE COURT:
Based on your prior experience, having been arrested and charged with an Attempted Rape, do you feel that, that prior experience would prohibit you from being able to be fair here?
PROSPECTIVE JUROR HORNE:
Yes. I still got bad feelings behind me, because something I ain’t did, and I stayed in jail for 90 days, for nothing. When I came to court, and heard the thing about a rape, it was thinking about memories — like what happened to me. Like, I don’t know. I don’t think so.
THE COURT:
All right. Are there any questions?
MR. LANDRY:
You would be unfair towards the State? Is that what you’re saying?
PROSPECTIVE JUROR HORNE:
I can’t really—
MR. LANDRY:
If you think that Mr. Taylor is guilty of rape, could you convict him. [sic]
PROSPECTIVE JUROR HORNE:
I can’t really tell. I heard everything it was about. All I’m saying is, I be [sic] thinking about what happened to me.
MR. LANDRY:
What I’m saying is, if you felt that he was guilty, would you convict him. Or would you say, No [sic], no. I don’t trust the DA. I’m just going to let a rapist go walk don’t [sic] the street.
PROSPECTIVE JUROR HORNE:
*81 No, I’d like to keep an open mind.
ImMR. LANDRY:
So you could convict him, if you felt he was guilty, [sic]
PROSPECTIVE JUROR HORNE:
It would still be on my mind.
THE COURT:
Could you clarify that a little bit.
PROSPECTIVE JUROR HORNE:
I don’t understand.
THE COURT:
Are you comfortable being a juror in this case?
PROSPECTIVE JUROR HORNE:

No. To tell you the truth. [Emphasis added.]

The district court then granted the State’s challenge for cause as to Mr. Horne.
La.Code Crim. Proc. art. 800(B) states that the erroneous allowance to the State of a challenge for cause does not afford a defendant a ground for complaint unless the effect of such ruling is the exercise by the State of more peremptory challenges than it is entitled to by law. In the instant case, the State exercised all twelve of its peremptory challenges permitted under La.Code Crim. Proc. art. 799. Thus, Taylor would have a ground for complaint if the district court erroneously granted the State’s challenge for cause as to Mr. Horne.
The applicable challenge for cause is pursuant to La. Code Crim. Proc. art. 797(2), which provides that the State or defendant may challenge a juror for cause on the ground that:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
I27A district court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Campbell, 06-0286, p. 73 (La.5/21/08), 983 So.2d 810, 858. Only where it appears, upon review of the voir dire examination as a whole, that the trial court’s exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the defendant, will an appellate court reverse that ruling. State v. Lee, 93-2810, p. 9 (La.5/23/94), 637 So.2d 102, 108.
We find that Taylor is correct that the State moved to challenge Mr. Horne for cause despite the fact that Mr. Horne had not yet indicated any problem with serving on the jury. Nevertheless, given what Mr. Horne said during the subsequent challenge conference and the information he volunteered during the general voir dire questioning, the record reflects overall that Mr. Horne had been deeply affected by his arrest and three-month incarceration on a charge of attempted rape. As stated above, at the challenge conference Mr. Horne replied in the affirmative when asked if his prior experience would prevent him from being fair. He said that when he realized it was rape trial he began thinking about what had happened to him, “[i]t” would still be on my mind.” The district court asked him if he would comfortable being a juror in the case, and Mr. Horne replied in the negative. Therefore, considering the record as a whole, we do not find that the district court abused its discretion in concluding that Mr. Horne could not be impartial. This assignment of error is without merit.
*82 SECOND ASSIGNMENT OF ERROR
In this assignment of error, Taylor complains that the district court erred in denying his motion for new trial, primarily based on erroneous and prejudicial Landings by the district court, a ground for new trial provided by La.Code Crim. Proc. art. 851(2).

A. Prescription as to Second Degree Kidnapping

Taylor first argues that the district court erred in denying his motion to quash Count Two, the charge of second degree kidnapping because of the State’s failure to timely institute prosecution, a ground for a motion to quash provided by La.Code Crim. Proc. art. 532(A)(7).
On August 5, 2011, Taylor filed a written motion to quash the bill of information as to Count Two (second-degree kidnapping) and Count Three (aggravated crime against nature), arguing that the six-year period of limitation for institution of prosecution had expired as to those two offenses — given that they had allegedly been committed in August 1994. The State filed a memorandum in opposition on August 5, 2011, arguing that prosecution had been timely commenced pursuant to the DNA time limitation exception in La.Code Crim. Proc. art. 572(B). The district court denied the motion to quash on August 5, 2011, without any hearing or argument that was transcribed, although both Taylor and his counsel were present, as was a representative of the State. A pretrial conference was also held on August 5, 2011. On the first day of trial, August 22, 2011, the State nolle prosequied the aggravated crime against nature charge, Count Three, mooting the prescription issue as to that count.
The bill of information in the instant case was filed on January 13, 2011, alleging that all three crimes charged had been committed on August 30, 1994. The general time limitation for prosecution, trial, or punishment for felony offenses necessarily punishable by imprisonment at hard labor, is presently six years under La.Code Crim. Proc. art. 572(A)(1). That period of limitation was also six years Launder then applicable La. Code Crim. Proc. art. 572 at the time the offenses in the instant case were allegedly committed on August 30, 1994. It is not disputed by the State in the instant case that this general six-year period of limitation had expired with respect to the second degree kidnapping charge at the time the bill of information was filed in the instant case.
In 2003, Subparagraph B was added to La.Code Crim. Proc. art. 572 by Acts 2003, No. 487, § 2, eff. June 20, 2003. La. C.Cr.P art. 572(B) states in pertinent part:
B. (1) Notwithstanding the provisions of Article 571.1 and Paragraph A of this Article, prosecutions for any sex offense may be commenced beyond the time limitations set forth in this Title if the identity of the offender is established after the expiration of such time limitation through the use of a DNA profile.
(2) A prosecution under the exception provided by this Paragraph shall be commenced within three years from the date on which the identity of the suspect is established by DNA testing.
(4) This Paragraph shall have retroactive application to crimes committed pri- or to June 20, 2003.
We note that in his motion to quash based on the expiration of the time limitations for institution of prosecution, trial, or punishment, Taylor expressly stated, as to the forcible rape charge, a violation of La. R.S. 14:42.1, that: “3. It is conceded that La. R.S. 14:42.1 has not prescribed as has the other charges.” Nevertheless, in his first pro se assignment of error, addressed *83 infra, Taylor raises an ex post facto argument as to both the forcible rape and second degree kidnapping charges.
lanThe State argued at trial and argues in its appellate brief that the DNA evidence exception in La.Code Crim. Proc. art. 572(B) applies to the charge in Count Two, second degree kidnapping.
Although La.Code Crim. Proc. art. 572(B) is not a criminal penal statute, but instead is a criminal procedure statute, the following statutory construction rules cited by the court in State v. Shaw, 06-2467, pp. 14-15 (La.11/27/07), 969 So.2d 1233, 1242 are helpful in interpreting it:
... a criminal statute, like all other statutes, should be interpreted so as to be in harmony with and to preserve and effectuate the manifest intent of the legislature; an interpretation should be avoided which would operate to defeat the object and purpose of the statute. [State v.] Brown, 03-2788 at 6,[ (La.7/6/04),] 879 So.2d [1276] at 1280; [State v. Broussard, [213 La. 338] 34 So.2d [883] at 884 [ (1948) ]. What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. State v. Williams, 00-1725, p. 13 (La.11/28/01), 800 So.2d 790, 800. Therefore, where the words of a statute are clear and free from ambiguity, they are not to be ignored under the pretext of pursuing their spirit, LSA-R.S. 1:4; State v. Freeman, 411 So.2d 1068, 1073 (La.1982).
Notably, La.Code Crim. Proc. art. 572(B) does not define “any sex offense” as used in the statute. Second degree kidnapping is defined in pertinent part by La. R.S. 14:44.1[3] as the forcible seizing and carrying of the victim from one place to | S1 another, or enticing or persuading of the victim to go from one place to another, “wherein the victim is” “sexually abused.” Thus, under the facts of the instant case, an element of the offense which the State had to prove beyond a reasonable doubt in order to convict Taylor of second degree kidnapping was that he “sexually abused” the victim.
Consequently, the State argues that the “basis” of the second degree kidnapping charge was “the fact that the victim was sexually abused during the kidnapping,” noting that Taylor was also charged with aggravated crime against nature, in violation of La. R.S. 14:89.1. However, we find that the bill of information simply charges Taylor with second degree kidnapping, without any specific reference to the element that the victim was sexually abused.
The State nolle prosequied the aggravated crime against nature charge on the *84 morning of trial. However, the victim testified at trial that Taylor forced her to orally copulate him before raping her. Given that the victim never identified Taylor as the man who allegedly kidnapped and assaulted her, the State sought to prove — through the use of the same DNA evidence it used at trial to prove that Taylor forcibly raped the victim — that he also kidnapped the victim.[4]
The State submits that both the aggravated crime against nature charge and the second degree kidnapping charge “fall within the broad ambit of the phrase ‘any sexual offense’ ” as used in La.Code Crim. Proc. art. 572(B).
|32The State submits that this reading is supported by the fact that Taylor was charged with all three of the original charges against him based upon the State’s ability to identity him due to the CODIS hit matching his known DNA profile to the theretofore unknown male DNA profile developed from the vaginal swab taken from the victim in the instant case on the day she was assaulted. The State argues that even if this court were to find that its argument in this regard is “somewhat reaching,” “it would be contrary to the spirit of the statute to allow for the prosecution of the sexual offense that led to the CODIS hit, but to forbid the prosecution of another charge that arises out of the same set of circumstances.”
Taylor essentially argues that second degree kidnapping is not a sex offense because “the crime itself is not listed as a sex offense.” He notes that, while crimes constituting “crimes of violence” are specifically defined/set out in La. R.S. 14:2, “sex offenses are listed only as they pertain to [sex offender] registration requirements,” citing La. R.S. 15:541. Taylor asserts that La. R.S. 15:541 “contains definition [sic] of sex offenses for purposes of sex offender registration,” and notes that second degree kidnapping “of an adult” is not included in the definitions of sex offenses. Id. Taylor is correct — but second degree kidnapping of even a minor is not included in the definitions of “sex offenses” in La. R.S. 15:541.
La. R.S. 15:541, part of the statutory scheme (La. R.S. 15:540, et seq.) relating to the registration of sex offenders, sexually violent predators, and child predators, expressly defines “aggravated offense” in Subparagraph (2)(g) as a conviction for the perpetration or attempted perpetration of, or conspiracy to commit, second degree kidnapping where the victim has not attained the age of eighteen years, citing La. R.S. 14:44.1. Aggravated and simple kidnapping are also defined as “aggravated offenses” in Subparagraphs (2)(f) and (2)(i), Irrespectively. Elsewhere in the statute, La. R.S. 15:541(24) defines “sex offenses” by specific offense. It includes nothing concerning second degree kidnapping or any other grade of kidnapping, only what one might expect to normally be defined as sex offenses, ranging from trafficking of children for sexual purposes to a second or subsequent conviction for voyeurism.
La.Code Crim. Proc. art. 571.1 currently provides for, and at the time of the instant offenses in 1994 (the provision was added by Acts 1993, No. 592, § 1, eff. June 15, 1993), provided for, extended time limitations within which to institute prosecution for certain enumerated “sex offenses.” Although La.Code Crim. Proc. art. 571.1 has been amended since its 1993 enactment to *85 add to its list of enumerated sex offenses, second degree kidnapping is not presently, nor has it ever been, enumerated as a sex offense in that article.
The State can point to no classification of second degree kidnapping as a “sex offense.” That the statutory “sex offender” registration scheme includes second degree kidnapping of a minor, in the list of enumerated offenses defined as “aggravated offenses,” instead of in the list of offenses defined as “sex offenses,” is evidence that the legislature does not consider second degree kidnapping, even of a minor, to be a “sex offense.” La. R.S. 14:44.1, proscribing second degree kidnapping, was enacted in 1989.
If, when adding Paragraph B to La. Code Crim. Proc. art. 572 in 2003, the legislature had intended to make the DNA evidence exception applicable to second degree kidnapping where the victim is sexually assaulted, it could have easily done so. Instead, the legislature made the DNA evidence exception applicable only to prosecutions for “any sex offense.” The gravamen of second degree kidnapping is kidnapping, not a sexual violation of the victim, while the gravamen of a sex lS4offense is a sexual violation of the victim. The State has failed to present evidence tending to show that the legislature intended the DNA exception to apply to second degree kidnapping, even those involving sexual assaults.
Generally, a trial court’s ruling on a motion to quash should not be disturbed on review absent an abuse of discretion. State v. Love, 00-3347, p. 12 (La.5/23/03), 847 So.2d 1198, 1208.
In his motion to quash based on the expiration of the six-year time limitation for the prosecution, trial, or punishment for second degree kidnapping as per La.Code Crim. Proc. art. 572(A), Taylor did not address the DNA evidence exception of La.Code Crim. Proc. art. 572(B). However, he did not need to, because the exception did not, on its face, apply, given that second degree kidnapping is not per se a “sex offense” or what one would normally consider to be a sex offense. The State cited La.Code Crim. Proc. art. 572(B) in its opposition to Taylor’s motion to quash.
While the record is lacking any indication that Taylor filed a written response addressing the State’s argument, the State filed its opposition the same morning the district court ruled on the motion, August 5, 2011 — although the certificate of service certifies that the State served a copy of the opposition upon defense counsel by hand and/or mail on August 4, 2011. The record contains no transcript of the August 5, 2011 court appearance by Taylor and his counsel at which the court denied the motion. Thus, it cannot be ruled out that defense counsel argued to the court that La.Code Crim. Proc. art. 572(B) did not apply to the second degree kidnapping charge because that offense is not a sex offense as contemplated by the statute. The issue and argument raised by Taylor on appeal that La.Code Crim. Proc. art. 572(B) does not apply because second degree | .^kidnapping is not a sex offense should be considered to have been preserved for appellate review.
Considering the facts and circumstances, we find that the district court clearly abused its discretion in denying Taylor’s motion to quash Count Two of the bill of information, charging second degree kidnapping, given that the offense is not a “sex offense.” Finding that this portion of Taylor’s second assignment of error does have merit, we reverse his conviction and sentence for second degree kidnapping.

*86
B. Admission of Evidence of Other Crimes

Taylor next argues that the district court erred in denying his motion for new trial based on what he alleges was the district court’s erroneous ruling admitting evidence of two prior crimes allegedly committed by him. This claim is based on his assertion that the district court erred in admitting the evidence because, although relevant, its probative value was substantially outweighed by its prejudicial effect, as per La. C.E. art. 408, set forth below.
The State submits that Taylor did not preserve this issue for review because he did not object to the introduction of the evidence on this ground, but only on the ground that the State failed to provide sufficient notice of the names of the two victims in these eases. We find that the State is correct that on the morning of the second day of trial, August 23, 2011, defense counsel objected to the State calling any witnesses to testify as to other crimes committed by Taylor because the defense had not received proper notice of the identity of the witnesses. No other objection to the other crimes evidence was voiced by Taylor. Thus, Taylor failed to preserve the objection that the evidence was inadmissible because its probative Rvalue was substantially outweighed by the prejudicial effect. See La.Code Crim. Proc. art. 841(A). Thus, this claim of error was not preserved for our review.

C. Lack of Chain of Custody for the DNA evidence

Taylor next contends that “[i]n failing to establish a complete chain of custody for the DNA evidence, the state failed to prove that the DNA results were reliable,” and that “[without the chain of custody, the reliability of the test results can not [sic] be guaranteed. Consequently, the evidence should have been excluded.”
Taylor filed a motion seeking to have published to the jury that the original chain of custody documents were destroyed during Hurricane Katrina. In this motion, which the district court denied, Taylor objected to the introduction of any test results derived from the original evidence on the ground that the original evidence could not be properly authenticated given the loss of the original documents evidencing the chain of custody. Thus, the claim of error raised here was preserved for review.
A defect in the chain of custody goes to the weight of the evidence rather than its admissibility. State v. Ferguson, 09-1422, p. 33 (La.App. 4 Cir. 12/15/10), 54 So.3d 152, 170. Evidence as to custody suffices if it establishes that it is more probable than not that the object is the one connected to the case. Id. A trial court is vested with great discretion in determining whether a party has laid a proper foundation for the introduction of evidence. Id.
Attached to Taylor’s district court motion was a June 28, 2006 note written by Jennifer Schroeder on paper bearing the letterhead of the NOPD Criminal Investigation Division, DNA Laboratory. The note states that in “Case 217” the case file was lost in Hurricane Katrina. The case filed contained the chain of |S7custody documenting the receipt of outsourced samples from the Central Evidence and Property room and the return of the outsourced samples. Ms. Schroeder noted, however, that photocopies of the original documents, where available, had been placed in the file to document that the proper procedures were carried out.
As stated above, Dr. Benado testified at trial that a nurse at the hospital was the liaison from the time the police officer *87 dropped off the rape kit used to collect the evidence from the victim until the time the officer picked up the completed and sealed rape kit. He twice stated during his testimony that the rape kit box “stayed with the nurse.” Dr. Benado personally collected all the evidence from the victim. Moreover, NOPD Detective Shields testified that he transported the victim to the hospital for a sexual assault examination, and further testified that he collected the rape kit from the hospital and took it to the Central Evidence and Property room. Det. Shields identified State Exhibit 2 as the evidence and property card, under Item # H-50397-94, reflecting his submission of the rape kit, as well as the victim’s underwear and blue jean cut off shorts.
As previously noted, forensic serologist Patricia Daniels testified that the rape kits came to the NOPD crime lab from the NOPD Central Evidence and Property room. She received the rape kit in S.B.’s case, and she identified State Exhibit 8 as her September 20, 1994 lab report prepared after examining the items in the rape kit for S.B., under NOPD item # H-50397-94. Her report showed that both internal and external vaginal swabs from S.B. were positive for seminal fluid, and that a vaginal smear from the victim was positive for spermatozoa. The report also reflected that one tube of blood from the victim was in the rape kit. Ms. Daniels did not sign an evidence inventory sheet or anything like that to signify her receipt of the rape kits. She testified that the crimi-nalist in the crime lab would go |aRto police Central Evidence and Property, pick up whatever was there, bring it to the crime lab, and put it at her station.
Forensic DNA expert Anne Montgomery, the DNA Technical Leader for the New Orleans Police Department Crime Lab at the time of trial in August 2011, as explained above, identified State Exhibit 10 as a chain of custody document the NOPD Crime Lab generated when it assigned, under NOPD item # H-50397-94, a unique sample number to the evidence sample, 2144, identified as one microfuge tube containing one vaginal swab, and victim reference sample, 2145, identified as one microfuge tube containing reference whole blood from the victim. The document, State Exhibit 10, had typewritten in generally, as to all the evidence samples listed on the document, that the items “were received with proper seal intact and with adequate security unless otherwise noted.” However, it was undated and did not reflect receipt or delivery of these two items.
Ms. Montgomery also identified State Exhibit 11 as a copy of the chain of custody document reflecting what she said was when NOPD Crime Lab personnel went to NOPD Central Evidence and Property to retrieve the samples and take them to the crime lab, whereupon they were stored in the freezer. It documented the item number, # H-50397-94, the date, August 28, 2004, and time, 12:44 p.m., the evidence was retrieved, who retrieved it, and that it was stored in the evidence freezer in the lab. State Exhibit 12 was a copy of the report from Reliagene submitted to the NOPD crime lab in the instant case. It reflected that one vaginal tube containing one vaginal swab and one victim reference blood stain card, sample numbers N02144 and N02145, under item # H-50397-94, were hand-delivered to Reliagene by Ms. Montgomery on February 15, 2005. The report, originally dated March 21, 2005, contained the DNA profiles generated by lasReliagene’s testing. Ms. Montgomery testified that the first page of State Exhibit 12, dated April 16, 2007, actually was an amended first page, the original first page, dated March 21, 2005, having incorrectly described evidence sample number N02145 as one microfuge tube containing *88 reference whole blood from the victim, when in fact, as stated in amended report, N02145 was a victim reference bloodstain card. The original evidence was a micro-fuge tube containing blood drawn from the victim during her rape examination, but the blood was transferred to cards for preservation, as the cards did not require refrigeration.
Taylor complains that the name of the nurse who kept custody of the completed rape kit was unknown, and she did not testify at trial. However, Dr. Benado testified that he personally collected all the forensic evidence from the victim during the sexual assault examination. He further testified that the evidence was placed in the rape kit box and sealed, and that the rape kit box “stayed with the nurse,” according to Dr. Benado, until a police officer picked it up.
Taylor erroneously argues in his appellate brief that from Dr. Benado the transfer of the rape kit evidence occurred when the Orleans Parish Coroner’s Office serologist Patricia Daniels received the rape kit, and that “there is no chain or paperwork validating how the evidence got from the hospital” to Ms. Daniels for testing. However, Det. Shields testified that he picked up the rape kit at the hospital and took it to NOPD Central Evidence and Property room where he logged it in. Dr. Benado signed the rape kit examination form at what he apparently mistakenly recalled was 4:00 p.m. (as opposed to 4:00 a.m.) on August 30.1994. Det. Shields identified the NOPD evidence and property receipt reflecting that he confiscated the rape kit and two items of clothing evidence at 4:20 a.m. on August 30, 1994, and that the evidence and property room received it 14ofrom him at 5:23 a.m. on that same date. A forensic laboratory report from the Orleans Parish Coroner’s Office signed by Patricia Daniels, with the date September 20, 1994, underneath her signature and typewritten name, reflects that the office received the evidence specimens in the case on September 1, 1994, two days after that evidence had been logged into the NOPD Central Evidence and Property Room.
Taylor states that between 1994 and 2004, the rape kit was apparently kept frozen but correctly complains that there is no paperwork to prove this. However, NOPD Crime Lab DNA technical leader Anne Montgomery identified State Exhibit 11 as reflecting when crime lab personnel went to NOPD Central Evidence and Property to pick up samples and take them to the crime lab where they were securely stored in the lab’s freezer on August 28, 2004. The next step was when Ms. Montgomery personally delivered the two samples, N02144 and N02145, to Re-liagene on February 15, 2005. Reliagene produced a male DNA profile and sent its March 21, 2005 report, containing the profile, to the crime lab. The Reliagene results were verified by the crime lab from the raw data, and that male DNA profile was then uploaded by the crime lab into the local LDIS and to the state SDIS, in 2006, as reflected by State Exhibit 14. Ultimately, that unknown male DNA profile was matched by CODIS in 2008 to the male DNA profile of Taylor that had been collected in connection with his arrest in Texas.
In Ferguson, supra, the defendant in that matter essentially made the same argument on appeal that Taylor makes in the instant case: that the DNA evidence linking the defendant to the rape and murder of the victim was inadmissible because the state failed to establish the chain of custody of the physical evidence, underwear and a T-shirt, which were processed to develop that DNA evidence. |4]This Court held, considering the record in its entirety— *89 primarily the testimony of police officers and DNA expert Anne Montgomery, who also testified in the instant case — that the jury was not unreasonable in concluding that “it was more probable than not that the evidence as identified at trial was in fact connected to [the] case.” Ferguson, 09-1422, pp. 35-36, 54 So.3d at 152.
In the instant case, in addition to the testimony and evidence discussed above, LSP Crime Lab forensic DNA expert Angela Delatte testified that — as to the DNA profile obtained from Taylor’s reference buccal swab matching the male DNA profile obtained from the sperm factor derived from the vaginal swab taken from the victim — the probability of finding the same duplicate male DNA profile from an unrelated, unknown, individual other than Taylor was one in six hundred thirty-eight trillion.
While no expert testified as to the probability that Taylor’s DNA profile might somehow have been derived by Reliagene in March 2005 — at a time when Taylor was not a suspect in the instant case — from some source other than the sperm sample obtained from the vaginal swab taken from the victim in 1994, given the testimony and evidence, common sense suggests that such possibility would have been so extremely remote as to have been, as a practical matter, virtually nonexistent. Thus, viewing all the facts, circumstances, and evidence in the instant case, the district court could have reasonably found that it was not only more probable than not, but also probable beyond a reasonable doubt, that the unknown male DNA profile later determined to have been Taylor’s was obtained from the sperm sample derived from the vaginal swab taken from the victim during her August 30, 1994 sexual assault examination. There is no merit to this argument.
| ,<LP. Missing DNA Evidence
In this claim of error Taylor argues that the district court erred in admitting the DNA evidence because the forensic samples, taken from the victim during her August 30, 1994 sexual assault examination, no longer exist, and thus he was unable to do his own testing. Taylor preserved this issue for review through his written motion filed three days prior to trial to independently test the original evidence or, in the alternative, suppress it because it no longer existed, arguing that he was thereby deprived of his rights under the Sixth Amendment’s Confrontation Clause. The district court denied that motion. It was verified in open court on the first day of trial, August 22, 2011, that, as best as could be determined, the vaginal swabs taken from the victim in the instant case had been lost or destroyed in the aftermath of Hurricane Katrina.
On appeal, Taylor argues that his inability to independently test the forensic evidence deprived him of his right to present a defense, a slightly different ground than asserted in his above-referenced motion. However, both grounds are based on Taylor’s rights under the Sixth Amendment, as well as his rights under La. Const, art. I, § 6.
This issue was addressed by this court in Ferguson, supra, which case also involved tangible evidence lost or destroyed in the aftermath of Hurricane Katrina. The court in Ferguson first cited La.Code Crim. Proc. art. 718, providing, in pertinent part, that a defendant can test tangible objects that “(1) are favorable to him and that are material and relevant to the issue of guilt of punishment; (2) are intended for use by the State as evidence at the trial; or (3) were obtained from or belong to the defendant.” Ferguson, 09-1422, pp. 28-29, 54 So.3d at 168.
*90 |43The court in Ferguson also cited State v. Clark, 414 So.2d 737, 740 (La.1982), where a defendant charged with aggravated rape filed a motion to quash his indictment on the ground that the State failed to preserve evidence that it had tested — a bed sheet containing a seminal fluid stain, and vaginal swabs and washings from a rape kit — for further testing by the defendant’s own his own expert(s). The district court granted the motion to quash. The Louisiana Supreme Court reversed. Id.
The court in Clark recognized that fundamental fairness is violated when a criminal defendant on trial for his liberty is denied the opportunity to have an expert of his choosing examine a piece of critical evidence whose nature is subject to varying expert opinion. Thus, the court reasoned where there is a sufficient amount of the evidence a defendant should be permitted to conduct an independent examination. However, the court expressly stated that “[t]he unavailability of the evidence for further testing does not in itself so prejudice defendant’s right to a fair trial so as to warrant a dismissal of the prosecution.” Clark, 414 So.2d at 741. The court further explained that “mere negligence in preserving evidence which prevents testing by defendant for possible exonerating characteristics, is not such a denial of fundamental fairness that the prosecution must be dismissed.” Id.
Taylor points out that the instant case was seventeen years old as of the time of trial. He argues that an alibi would be impossible to remember given this passage of time, and that locating any alibi witness would be impossible as well.
Defense counsel thoroughly cross examined the State’s DNA experts as to their DNA testing procedures and the results thereof. Nevertheless, there was no indication that any lab work done in this case on the evidence taken from the victim was deficient. Defense counsel also thoroughly cross examined those]^witnesses and others as to alleged defects in the chain of custody of the evidence gathered from the victim during her sexual assault examination. Taylor does not dispute that his known DNA profile — at least the one generated by the LSP Crime Lab, which processed a known reference buccal swab reference obtained from Taylor after he was linked to the instant offenses by a CODIS match — matches the what is purported to be a male DNA profile developed by Relia-gene in 2005 from the evidence obtained from the victim in 1994. Taylor offered no explanation as to how Reliagene might have obtained his DNA profile in 2005 other than by the processing of that evidence obtained from the victim in 1994. Nor did he offer any explanation as to how evidence obtained from the victim in 1994 might have, for example, become contaminated with his DNA.
The unfortunate destruction of the forensic evidence obtained from the victim in this case before Taylor had an opportunity to test it did not deprive him of his right to present a defense guaranteed under the federal and state constitutions. Thus, we find that there is no merit to this claim of error.

E. Confrontation Right Violation

In this claim, Taylor argues that his confrontation rights were violated because no one testified who participated in the DNA testing in Texas. The Texas DNA testing led to his DNA profile being uploaded into CODIS and a match ultimately being generated between it and the unknown DNA profile generated by Relia-gene in 2005, which was uploaded into the Louisiana SDIS in 2006. Taylor also complains that everyone who “contributed to creating the DNA profile in Louisiana,” presumably meaning from the reference buccal swabs taken from him after his 2010 *91 arrest, did not testify, and thus his confrontation rights were also violated. Finally, Taylor notes that one technician involved in the Reliagene [^testing and one technician involved in the testing of the reference buccal swabs at the LSP Crime Lab did not testify, and thus his confrontation rights were thus violated.
Taylor relies upon two United States Supreme Court cases in support of this claim: Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and Bullcoming v. New Mexico, — U.S. -, 131 S.Ct. 2705, 180 L.Ed.2d 610(2011).
In Crawford, supra, the Supreme Court held that the admission of “testimonial” hearsay evidence violates the Sixth Amendment’s Confrontation Clause — the right to confront one’s accusers or witnesses against him. The hearsay the Court found testimonial in Crawford was a recorded statement given by the defendant’s wife to police after she had been advised of her Miranda[5] rights.
In Bullcoming, supra, a progeny of Crawford, the Supreme Court held that a forensic DNA laboratory report containing a certification made for the purpose of proving a particular fact constituted testimonial hearsay. Thus, the Court held that the State’s introduction of such a certification through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification, violated the defendant’s rights under the Confrontation Clause.
Nevertheless, the United States Supreme Court recently rendered a decision in another Crawford progeny, Williams v. Illinois,-U.S.-, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), involving a defendant identified as a suspect in a February 2000 rape case after an unknown male DNA profile derived from forensic 14fievidence in the case was found to match the defendant’s known DNA profile derived from a blood sample obtained from him following his August 2000 arrest on an unrelated charge. At his trial, a DNA expert, who had no connection to the DNA testing actually performed in connection with the case, testified that the unknown male DNA profile produced by a private DNA lab, Cellmark, from vaginal swabs taken from the rape victim, matched the male DNA profile produced from the sample of the defendant’s blood. At the time Cellmark had sent its DNA report to the state police lab, the defendant was not a suspect in the February 2000 rape case.
The U.S. Supreme Court framed the narrow issue presented in Williams as whether Crawford “bar[s] an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify[.]” Williams, — U.S. at-, 132 S.Ct. at 2227. The Court held:
this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted.... Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.
Id., — U.S. at-, 132 S.Ct. at 2228. The Louisiana Supreme Court interpreted and applied Williams, in State v. Bolden, 11-2435, pp. 3-4 (La.10/26/12), 108 So.3d 1159, 1161-1162. Additionally, the Louisiana Supreme Court in Bolden further held *92 that under Louisiana law computer-generated statements, such as computer printouts of DNA profiles developed by laboratories using software, were non-hearsay— they do not constitute statements of a declarant for purposes of La. C.E. |47art. 801. Id., 11-2435, p. 4, 108 So.3d at 1162 (citing State v. Armstead, 432 So.2d 837, 839 (La.1983)).
In the instant case, the then unknown male DNA profile (later found to match Taylor’s DNA profile) was developed by Reliagene as early as March 21, 2005, the date of its first report, from vaginal swabs taken from the victim in 1994. Taylor was not a suspect in the case at that time. He did not become a suspect until, at the earliest, October 6, 2008, when a computer-generated hit in the CODIS database matched the DNA profile developed by Reliagene with his known DNA profile that had been obtained after an arrest in Texas.
Therefore, under Williams and Bolden, any evidence introduced as to that CODIS match, whether it was the testimony of Anne Montgomery or the actual computer-generated copy of the match, did not violate Taylor’s rights under the Confrontation Clause. Under Williams, no one from Reliagene had to testify concerning its development of the DNA profile from the vaginal swabs taken from the victim. It sufficed that Angela Delatte, with the LSP Crime Lab, testified that a DNA profile of Taylor, developed by the LSP lab from the reference buccal swabs obtained from him after his late 2010 arrest in the instant case, matched the male DNA profile developed by Reliagene in 2005. Under Williams, Taylor was not denied any confrontation rights by the failure of any other technician from Reliagene or the LSP Crime Lab to testify. There is no merit to this claim of error.
For the foregoing reasons, the only merit to any part of Taylor’s Assignment of Error No. 2 is as to Subpart A, that the district court erred in denying his motion for new trial on the ground that it had erred in denying his pretrial motion to quash the charge of second degree kidnapping, Count Two, on the ground of the |4Sexpiration of the statute of limitations for the institution of prosecution. Thus, we reverse conviction and sentence for second degree kidnapping on that basis.

PRO SE ASSIGNMENT OF ERROR NUMBER ONE

Lastly, we address the remaining pro se assignment of error of Taylor that the application of La.Code Crim. Proc. art. 572(B)[6] — the DNA exception to the general time limitations for the institution of prosecution enacted by Acts 2003, No. 487, § 2, eff. June 30, 2003 — violated the Ex Post Facto Clauses of the United States and Louisiana constitutions.
The Fifth Circuit explained the Ex Post Facto Clause and its application as follows:
Ex Post Facto application of criminal laws by the state is prohibited by Article *93 I, § 10 of the United States Constitution and Article I, § 23 of the Louisiana Constitution. This prohibition has traditionally extended only to penal statutes which disadvantage the offender affected by them. In Collins v. Youngblood, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), the United States Supreme Court determined that the constitutional prohibition against ex post facto laws is triggered by a statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime 149of any defense available according to the law at the time when the act was committed.
In State v. Rolen, 95-0347 (La.9/15/95), 662 So.2d 446, 448, the Louisiana Supreme Court discussed the features of an ex post facto law:
For a criminal or penal law to fall within this prohibition, it “must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.” Weaver v. Graham, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981). “Critical to relief under the Ex Post Facto Clause,” Weaver observes, “is not an individual’s right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.” Id. (Emphasis supplied). The Ex Post Facto Clause therefore assures “that persons have fair notice of potential criminal punishment and will be able to rely for their conduct on the criminal law as it exists at the time of their acts.” Prater v. United States Parole Comm’n, 764 F.2d 1230, 1239 (7th Cir.1985).
State v. Robinson, 97-269, pp. 9-10, 713 So.2d 828, 832.
Taylor avers that the application of La. Code Crim. Proc. art. 572(B) by the district court permitted his prosecution on the charges of forcible rape and second degree kidnapping after the expiration of the six-year period of limitation for those charges under art. 572, as in effect at the time the offenses were allegedly committed on August 30, 1994 in contravention of the above-referenced Ex Post Facto Clauses and is therefore unconstitutional. The provision of the statute to which he objects as applied to him applies to all cases involving sex offenses where the statute of limitations has expired prior to a perpetrator being identified by DNA evidence, and it applies retroactively to all crimes committed prior to June 20, 2003, which could result in a considerable impact. Taylor essentially argues that the statute is unconstitutional as to him and the untold numbers of those in his circumstances.
IsnThe general rules governing the procedural requisites for attacking the constitutionality of a state statute govern Taylor’s ex post facto claims; therefore, this constitutional challenge had to be properly pled in the district court. See Johnson v. Aymond, 97-1446, p. 4 (La.App. 3 Cir. 4/1/98), 709 So.2d 1072, 1074-1075. Additionally, in State v. Bazile, 12-2243, p. 8 (La.5/7/13), — So.3d -, 2013 WL 1880395, the Louisiana Supreme Court further explained the procedure for raising a constitutional challenge of a state statute:
This court has long held the unconstitutionality of a statute must be specially pleaded and the grounds for the claim particularized. State v. Hatton, 2007-2377, p. 14 (La.7/1/08); 985 So.2d 709, 719; [State v.] Schoening, 2000-0903, p. 3 [ (La.10/17/00) ]; 770 So.2d [762,] at 764. In Hatton, the court set out the challenger’s burden as a three-step anal *94 ysis. “First, a party must raise the unconstitutionality in the trial court; second, the unconstitutionality of a statute must be specially pleaded; and third, the grounds outlining the basis of unconstitutionality must be particularized.” Id., 2007-2377, p. 14; 985 So.2d at 719. In addition, “the specific plea of unconstitutionality and the grounds therefor must be raised in a pleading.” Id.; 2007-2877, p. 15; 985 So.2d at 720.
In the instant case, given that Taylor has only raised the Ex Post Facto Clause issue on appeal, the issue of whether La.Code Crim. Proc. art. 572(B), as applied to Taylor, is unconstitutionally ex post facto is not properly before this Court. While this assignment of error may have merit[7], this constitutional ex post facto argument was not raised by Taylor in his written motion to quash based on prescription filed in the district court as to the second degree kidnapping charge, and in that same motion Taylor expressly conceded that the forcible rape charge |B1had not prescribed. There is no indication that Taylor raised the issue at the time the motion was considered and denied in open court with all parties present on August 5, 2011, and there is no indication that the district court considered the issue when denying Taylor’s motion to quash from our review of the record.
Finally, we note Taylor can file an application for post conviction relief alleging ineffective assistance of counsel for failing to raise the ex post facto argument in his motion to quash as to second degree kidnapping, and also for expressly conceding that the forcible rape charge had not prescribed and for not raising the ex post facto argument as to that charge. Furthermore, because Taylor has only raised prescription as to the forcible rape charge only once in this court and this claim is not properly before us, he can raise this issue directly in an application for post conviction relief. See La.Code Crim. Proc. art. 930.3. Thus, we expressly reserve unto Taylor his right to raise the issue for the first time in an application for post conviction relief, wherein he will be able to comply with the procedural requirements set forth in Bazile, supra.
Accordingly, for the foregoing reasons, we find that Taylor’s ex post facto argument attacking the constitutionality of La. Code Crim. Proc. art. 572(B) as applied to him was not preserved for review as to either the second degree kidnapping charge or the forcible rape charge. However, as previously discussed, because we reverse Taylor’s conviction and sentence for second degree kidnapping this constitutional challenge to the second degree kidnapping charge is moot.
DECREE
For the foregoing reasons, we reverse the conviction and sentence of Troy Taylor for second degree kidnapping, Count Two, given that second degree |,^kidnapping is not a sex offense as contemplated by La. Code Crim. Proc. art. 572(B). We find that the district court clearly abused its discretion in denying his motion to quash based on the expiration of the six-year limitation for the institution of prosecution, and consequently erred in not granting his motion for a new trial based on the prior erroneous ruling on the motion to quash. *95 In all other respects, the conviction and sentence of Troy Taylor for forcible rape, Count One, is affirmed, and his right to raise the expiration of the time limitation for the institution of prosecution on application for post conviction relief, is expressly reserved unto him.
REVERSED IN PART AND AFFIRMED IN PART

. State v. Taylor, unpub., 11-1157 (La.App. 4 Cir. 8/22/11).

. The record does not indicate, but Sgt. Kennedy appears to be employed by the Houston Police Department.

. La. R.S. 14:44.1 states:
A.Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
(1) Used as a shield or hostage;
(2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;
(3) Physically injured or sexually abused;
(4) Imprisoned or kidnapped for seventy-two or more hours, except as provided in R.S. 14:45(A)(4) or (5); or
(5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
B. For purposes of this Section, kidnapping is:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
C. Whoever commits the crime of second degree kidnapping shall be imprisoned at hard labor for not less than five nor more than forty years. At least two years of the sentence imposed shall be without benefit of parole, probation, or suspension of sentence.

. Double jeopardy is not an issue on appeal. Defendant raised it as a ground in a separate (from the motion to quash raising prescription as to second degree kidnapping) written motion to quash, and as an alternative ground for his motion for new trial, but does not complain of any error on appeal based on double jeopardy.

. See footnote 3.

. Article 572 of the Louisiana Code.Crim. Proc. provides in pertinent part:
A. Except as provided in Articles 571 and 571.1, no person shall be prosecuted, tried, or punished for an offense not punishable by death or life imprisonment, unless the prosecution is instituted within the following periods of time after the offense has been committed:
(1) Six years, for a felony necessarily punishable by imprisonment at hard labor.
B. (1) Notwithstanding the provisions of Article 571.1 and Paragraph A of this Article, prosecutions for any sex offense may be commenced beyond the time limitations set forth in this Title if the identity of the offender is established after the expiration of such time limitation through the use of a DNA profile.
(4) This Paragraph shall have retroactive application to crimes committed prior to June 20, 2003.

. See Stogner v. California, 539 U.S. 607, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003), wherein the United States Supreme Court held that the application of a California law permitting prosecution for sex-related child abuse within one year of a victim's report to police to offenses whose prosecution was time-barred at the time of the law's enactment was unconstitutionally ex post facto.